UNITED STATES of America, Plaintiff,

v.

Jose Guillermo HARO, et al., Defendants.

No. 87–CR–63.

United States District Court, E.D. Wisconsin.

May 10, 1988.

Eric J. Klumb and R. Jeffrey Wagner, Asst. U.S. Attys., Milwaukee, Wis., for plaintiff.

William U. Burke, Milwaukee, Wis., and Rebekah J. Poston, Miami, Fla., for defendants.

## DECISION AND ORDER

WARREN, Chief Judge.

Defendant Jose Guillermo Haro was one of nine persons charged in a 16–count Indictment returned May 26, 1987, by a federal grand jury sitting for the Eastern District of Wisconsin. Defendant Haro was named in Count One of the Indictment only, which charged conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a) and 846 and 18 U.S.C. § 2. The Indictment also contained forfeiture provisions under 21 U.S.C. § 853. One specific forfeiture provision listed "[a]ny financial interest of JOSE GUILLERMO HARO in real estate located at 900 Red Road (57th Avenue[)], Miami, Florida...."

On February 4, 1988, following a month-long trial, a jury returned verdicts against four of the defendants named in the Indictment, including defendant Haro. He was found guilty of the offense charged in Count One.

Presently pending before the Court is a resolution of the forfeiture provision of the Indictment relating to the Red Road property. Following the return of the February 4 verdicts, the United States ("government") and defendant Haro stipulated that the forfeiture of the Red Road property would be resolved by the Court based on the testimony received during trial and on briefs submitted by the parties. The parties have since completed their briefing.

The Court now finds that any financial interest of defendant Haro in the Red Road property, as listed in paragraph 2(b) of the forfeiture provisions of the Indictment, shall be forfeited to the United States pursuant to 21 U.S.C. § 853.

## I. FINDINGS OF FACT

The Court finds the following facts were proved beyond a reasonable doubt by the

United States during the month-long trial against defendant Haro.[1] The Court groups these facts into three categories: (A) general findings, consistent with the jury verdict, as to defendant Haro's role in the cocaine conspiracy, including an evaluation of the credibility of certain testimony; (B) specific findings as to the financial sources for the Red Road property; and (C) specific findings as to the characterization of the Red Road property.

## A. *General Findings*

Menelao Orlando Estevez, Omar Estevez and others in their family were the heads of a multi-kilogram cocaine distribution ring. The ring was responsible for the transfer of millions of dollars worth of cocaine from Southern Florida to Milwaukee, Wisconsin. Much like a modern corporation, the ring had various personnel performing specific duties. For example, the ring had persons engaged in supply, transportation and distribution. The work of one conspirator was not necessarily known by another. However, all the members of the ring were aware that its purpose was to unlawfully distribute cocaine in Wisconsin.

Defendant Haro, a real estate lawyer in Miami, Florida, was a member of that cocaine ring. Although he may not have known the exact extent and nature of the ring, he knowingly assisted its cocaine distribution through specific legal work. That legal work included "laundering" the cash profits of the Estevezes so as to avoid detection of the profits by law enforcement officials. In particular, defendant Haro purchased three parcels of property in his own name when in fact the parcels were to be the property of Orlando Estevez and his family. Those three parcels, and their approximate date of purchase, were:

(1) a residence located at 1121 S.W. 95th Street, Miami; purchased October 1, 1985;

(2) a lot located at 9000 Red Road (S.W. 57th Avenue), Miami; purchased November 5, 1985; and

(3) a residence located at 11712 S.W. 97th Street, Miami; purchased August 19, 1986.

The purchase by defendant Haro of the three parcels can be traced to a series of cash transactions under the amount of $10,-000. Defendant Haro would take Estevez money, launder it through his personal and attorney trust accounts, and then use those accounts to purchase cashier checks in amounts under $10,000. The 97th Street property purchase was linked to eight different currency transactions in amounts under $10,000, (Exhibit 703), and the 95th Street property was linked to nine different currency transactions in amounts under $10,000, (Exhibit 700). Since the cash transactions were in amounts under $10,-000, the financial institutions involved did not have to generate a Cash Transactions Report. Defendant Haro knew that these reports were often reviewed by agents of the Federal Bureau of Investigation for the purpose of monitoring large transfers of cash.

Defendant Haro also assisted the Estevez family in organizing and incorporating Christian Agriculture Corporation, which was to be used by the Estevez family to further launder proceeds from drug transactions.

Following the arrest of Orlando Estevez in August of 1986 on drug charges, defendant Haro engaged in activity to conceal his involvement with the Estevez ring. Leases for the 97th and 95th Street properties were back-dated by defendant Haro and

---

1. Rule 23 of the Federal Rules of Criminal Procedure provides, in part:

(C) TRIAL WITHOUT A JURY. In a case tried without a jury the Court shall make a general finding, and shall in addition, on request made before the general finding, find the facts specially. Such findings may be oral. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein.

In their briefs, neither side made an explicit request for special factual findings. The parties' arguments as well as the nature of the dispute, however, warrant the special findings contained herein.

The Court adds that the briefing of the parties was done without the benefit of a complete trial transcript. A transcript of the testimony of Elana Gonzalez and partial transcripts of the testimony of other witnesses were made part of the record during trial.

signed by members of the Estevez family so as to make it appear that defendant Haro had merely rented the property to the Estevezes. The lease on the 95th Street property contained an option to buy so that defendant Haro could explain the massive improvements that had been made on the property by the Estevezes. The improvements included the addition of a circular driveway, a pool, an extension of the house, landscapping and complete decorations inside.

The bulk of the above information came from the testimony of Elana Gonzalez, the 22-year-old girlfriend and later fiance of Orlando Estevez. Ms. Gonzalez began dating Orlando Estevez in March of 1986. She was privy to the inner workings of the Estevez family from this time through the latter part of May, 1987, and was herself charged with conspiracy to distribute cocaine. Pursuant to a plea agreement, she plead guilty to misdemeanor possession on June 2, 1987, and received a sentence of two years probation. Cooperation with the United States was not a requirement of the plea agreement. On June 10, 1987, Ms. Gonzalez contacted Assistant United States Attorneys in the Eastern District of Wisconsin and expressed a desire to cooperate with the government. As a result of her cooperation, her sentence was reduced to one year probation with expungement. She also received immunity for her testimony in this case.

The Court, after observing Ms. Gonzalez on the stand for approximately two days of questioning, finds her testimony credible. Due to a falling-out with the Estevezes— which included threats against her and her mother—Ms. Gonzalez would apparently be biased against Orlando Estevez. Her testimony, however, detailed the involvement of others in the Estevez ring. In particular, she detailed a series of meetings with defendant Haro which revealed his role in the ring and the true ownership of the three pieces of property. The Court does not see what she would have to gain by lying about the involvement of defendant Haro.

On the other hand, the Court finds that the testimony of defendant Haro relating to his involvement with the Estevezes and the true ownership of the three properties was incredible. Though a lawyer and devoted family man, Mr. Haro aided the Estevez cocaine ring with his legal knowledge. He did not use cocaine or even come in contact with the substance directly. But he did assist its illegal distribution in Wisconsin. His testimony at trial denying this involvement was contrary to the great weight of the evidence. Furthermore, his description of a safe deposit box containing approximately $250,000 of his father's lifetime savings, and his subsequent attempt to conceal the money for fear of tax consequences, was simply unbelieveable to the Court.

### B. *Financial Source For The Red Road Property*

Defendant Haro executed a real estate contract on the Red Road property on August 8, 1985. The purchase price was to be $170,000, broken down as follows:

| | |
|---|---|
| Cash Deposit: | $16,000.00 |
| Mortgage Assumed: | 90,000.00 |
| Cash Paid To Close: | 63,000.00 |

At the time of closing, November 5, 1985, defendant Haro assumed a mortgage in the amount of $89,302.49 and paid $63,031.05.

Thus defendant Haro paid a total of $79,031.05 for the property.

The $79,031.05 was not paid in a lump sum or even in two amounts accounting for the deposit and cash paid to close. Rather, multiple checks were used, all but one in amounts under $10,000.

The deposit consisted of a $1,000 cash payment and two checks from defendant Haro's P.A. trust account. One check, in an amount of $8,000, was dated September 3, 1985. That same day defendant Haro deposited $8,000 cash into his trust account. The second check, in the amount of $7,000, was dated September 4, 1985. On September 5, 1985, defendant Haro deposited $7,000 cash into his trust account.

The cash paid to close consisted of four cashiers checks. Three of the checks were in amounts under $10,000 and were purchased by defendant Haro with cash. The fourth, in the amount of $35,384.05, was purchased by defendant Haro with a check drawn on the account of his parents. The

parents' account, however, received deposits totaling $35,000 during September, 1985, and none other prior to the account being used for the $35,384.05 cashiers check. The $35,000 in deposits were made on four different occasions between September 20 and September 25. The first deposit was $9,500 and consisted of a $5,000 check from defendant Haro's P.A. account and $4,500 in cash. The second deposit was $9,500 in cash. The third was an $8,000 check from defendant Haro's personal account. But only a few days prior, on September 20, defendant Haro deposited $8,000 cash into his personal account. The fourth deposit in the parents' account was $8,000 in cash.

Therefore, all but $5,384.05 of the $79,031.00 paid by defendant for the Red Road property can be traced to cash.[2]

The mortgage assumed by defendant Haro was with Flagler Federal Savings in Miami. On November 5, 1985, the day of the closing, defendant Haro opened an account at Flagler Federal. The initial deposit into that account was a $50,000 bail refund check issued by the Dade County Circuit Court Clerk. (Exhibit 694b). The check was dated October 2, 1985, and was endorsed by Omar Estevez to defendant Haro. The check was for the return of bail from Omar Estevez's concluded drug case in Florida. Defendant Haro had assisted the Estevez family in purchasing a cashiers check for the bail in the spring of 1985. Defendant Haro testified that he lent the Estevezes $4,700 for the posting of the $50,000 bond.

Of the $50,000 in the Flagler account, $40,000 was withdrawn with no record as to where it went. The remaining $10,000 was used to make monthly mortgage payments on the Red Road property through March of 1986 and to pay other expenses related to the Red Road property. The account also was used to pay expenses of the 97th Street property.

On January 30, 1986, defendant Haro borrowed $70,000 on the 95th Street property and deposited the proceeds in an account at the Ponce de Leon Federal Savings and Loan Association in Miami. Funds were transferred, on a quarterly basis, from the Ponce account to the Flagler account for the purpose of making monthly mortgage payments on the Red Road property. These payments were made from March of 1986 through November of 1986. (Exhibits 681, 694 and 695). Approximately half of the mortgage payment for December of that year was paid in that fashion as well.

### C.  *Characterization Of The Red Road Property*

Four different witnesses—Elena Gonzalez, Larry Jackman, Maria Pinto and Evelio Pinto—testified that upon being shown the Red Road property by Orlando Estevez, Estevez described the property as the place he was going to build his dream house. Ms. Gonzalez stated that Orlando Estevez told her in March of 1986 that he owned the property and that it had been purchased "awhile back." (Gonzalez Tr. at 43).

Orlando Estevez also told Larry Jackman that Columbians had a cocaine laboratory at the property, even though the only building there at the time was dilapidated and apparently uninhabited.

During one meeting involving Orlando Estevez, Elana Gonzalez and defendant Haro, defendant Haro showed Estevez a bank account in defendant Haro's name that defendant Haro said contained Estevez money for payments on the 95th Street and Red Road properties. (Gonzalez Tr. at 49–50). During another meeting, defendant Haro described how the property on Red Road was being paid off. (Gonzalez Tr. at 50).

Defendant Haro testified that the property was purchased in his own name because he was to be the true owner of the property. His testimony also showed that he drew a weekly salary of between $3,000 and $6,000. He testified that some of his salary money was commingled with bor-

---

**2.** This accounting was summarized in Exhibits 701 and 702. The exhibits are reproduced at Appendices A and B.

rowed funds and money of his father. He then used this cash for the down payment checks and the cash to close on the Red Road property. His testimony that he borrowed money from family members and friends was corroborated by other witnesses.

Defendant Haro and his father testified as to the existence of a safe deposit box containing almost $182,000 in money earned by the father from 13 years of work as a laborer and shuttle service operator. The safe deposit box also supposedly contained $60,000 from money that defendant Haro's father had brought from Cuba, for a total cash supply of about $242,000.

Defendant Haro testified that he structured the purchase of the Red Road property in amounts under $10,000 so that his father's savings would not be disclosed. Defendant Haro testified that he knew his father had not paid taxes on the money and that his father would be unable to vouch for its legality if it were disclosed.

Although the Court believes defendant Haro received cash loans from family members, the Court does not believe that those loans were obtained in order to purchase the Red Road property. The Court also does not believe defendant Haro's contention that he structured the payments on the property in amounts under $10,000 so that the United States would not detect the large amounts of cash his father had supposedly saved.

## II. DISCUSSION

Title 21, United States Code, § 853 provides in part:

> **Property subject to criminal forfeiture**
>
> (a) Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law—
>
> (1) any property constituting, or derived from, any proceeds the person obtained directly or indirectly, as the result of such violation;
>
> (2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and
>
> (3) in the case of a person convicted of engaging in a continuing criminal enterprise in violation of section 848 of this title, the person shall forfeit, in addition to any property described in paragraph (1) or (2), any of his interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise.
>
> \* \* \* \* \* \*
>
> **Rebuttable presumption**
>
> (d) There is a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter or subchapter II of this chapter is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that—
>
> (1) such property was acquired by such person during the period of the violation of this subchapter or subchapter II of this chapter or within a reasonable time after such period; and
>
> (2) there was no likely source for such property other than the violation of this subchapter or subchapter II of this chapter.
>
> \* \* \* \* \* \*
>
> **Construction**
>
> (o) The provisions of this section shall be liberally construed to effectuate its remedial purposes.
>
> \* \* \* \* \* \*

■ Before applying the facts of this case to the relevant portions of § 853, the Court addresses the argument of defendant Haro that the rebuttable presumption of subsection (d) is unconstitutional. In his brief, defendant Haro contends that subsection (d) impermissibly shifts the burden of proof to the defendant in a criminal case. The government responds that the rebuttable presumption is permissive, not mandatory, thus it passes constitutional muster.

To date, the Seventh Circuit Court of Appeals has not addressed the applicability or constitutionality of § 853. The Third Circuit, however, has upheld the constitu-

tionality of the rebuttable presumption based on the conclusion that forfeiture is punishment for a crime, not an element of the offense. *United States v. Sandini*, 816 F.2d 869, 875 (1987). This reasoning is consistent with the view of the Ninth Circuit. *See United States v. Littlefield*, 821 F.2d 1365, 1368 (1987), (criminal forfeiture is form of punishment subject to Eighth Amendment analysis). The research of the parties, as well as the Court, has revealed no interpretations of § 853 other than those of the Third and Ninth Circuits. The Court would add, though, that the Third Circuit's analysis in *Sandini* was quite exhaustive. Not only was the rebuttal presumption provision analyzed, but the legislative history was tracked also.

Legislative history reveals Congress' belief that forfeiture would provide as effective a weapon against the drug trade as it would in combatting organized criminal activity through the RICO statute. Because an earlier version of the forfeiture provision contained limitations and ambiguities that had hindered its use in drug cases, amendments were enacted in 1984 to improve the procedures.

These statutory modifications were designed to emphasize criminal, rather than civil, forfeitures so that prosecutors could develop in one proceeding the facts necessary to establish guilt as well as to justify forfeiture. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 191–212, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3374–3395. The Senate Judiciary Committee noted that the government's burden of proof set out in the amendments is the civil standard. The statutory "presumption" was characterized as a "a permissive and rebuttable inference" and, therefore, was expected to be within constitutional bounds. *Id.* at 3395.

\* \* \* \* \* \*

A brief review of the two kinds of forfeiture actions aids an understanding of the defendant's position. Sharp differences exist between the in rem and in personam forfeitures, and failure to observe them sometimes leads to confusion.

Civil forfeiture is an in rem proceeding. The property is the defendant in the case, and the burden of proof rests on the party alleging ownership. The innocence of the owner is irrelevant—it is enough that the property was involved in a violation to which forfeiture attaches.

In rem procedures enjoy a venerable history and existed in Mosaic law if not in other ancient codes as well. Blackstone speaks of the Biblical rule: "When an ox gore a man or a woman to death, the ox must be stoned; its flesh may not be eaten." Exodus 21:28. *See Goldsmith–Grant Co. v. United States*, 254 U.S. 505, 511, 41 S.Ct. 189, 191, 65 L.Ed. 376 (1921). In medieval times, the law of deodands required forfeiture of a chattel that had caused the death of a person. *See Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 681, 94 S.Ct. 2080, 2090, 40 L.Ed.2d 452 (1974).

In rem forfeiture was used in the early history of this country to enforce the revenue laws and to provide a remedy in maritime actions. *See United States v. Stowell*, 133 U.S. 1, 17, 10 S.Ct. 244, 247, 33 L.Ed. 1 (1890). However inapplicable its original justification may be today, in rem, or civil forfeiture, has become "too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced." *Goldsmith–Grant Co.*, 254 U.S. at 511, 41 S.Ct. at 191.

In contrast, criminal or in personam forfeiture differs because its prime objective is punishment of the owner. *See United States v. Kravitz*, 738 F.2d 102, 106 (3d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985). The owner or possessor of the property is the defendant, and the burden of proof falls on the government. Insofar as the forfeiture rests on illegal activity, the elements of the underlying crime must be established by proof beyond a reasonable doubt.

Criminal forfeiture of property was disfavored during the country's infancy. The Act of April 30, 1790, ch. 9, § 24, 1 Stat. 117, stated that "no conviction or judgment ...shall work corruption of

blood, or any forfeiture of estate." *See also* U.S. Const. art. III, § 3. The statutory proscription rejected the traditional forfeiture of all of a felon's property even if it had no connection with the crime. The colonists' experience with the English law of forfeiture created an antipathy toward its use, which was reflected in its prohibition by the First Congress.

Although civil actions for forfeitures continued, criminal forfeitures remained neglected until recent years when Congress revitalized them as penalties for RICO and narcotics violations.

## II.

Because criminal forfeitures are based on findings of personal guilt, efficiency suggests that the issues of culpability and forfeiture be determined in the same proceeding. The desirability of this approach becomes apparent when one recognizes that Congress intended forfeiture as punishment for the underlying crime.

\* \* \* \* \* \*

[Defendant] also argues that the statutory presumption is unconstitutional because it reduces the government's burden to a preponderance of the evidence instead of proof beyond a reasonable doubt.

\* \* \* \* \* \*

As indicated above, however, forfeiture is punishment for the crime. Forfeiture is not an element of the continuing legal enterprise offense, but simply an additional penalty for that proscribed conduct. *United States v. Grammatikos,* 633 F.2d 1013, 1025 (2d Cir.1980).

The argument that forfeiture is an element which must be proved beyond a reasonable doubt confuses culpability with consequences. Section 853(a) expressly says that "[t]he court, in imposing sentence ...shall order, in addition to any other sentence ...that the person forfeit ...all property described in this subsection." The statute, in effect, characterizes forfeiture as punishment for the crime and not part of the offense itself.

Nor does the requirement of including forfeiture allegations in the indictment dictate a contrary conclusion. Fed.R. Crim.P. 7 requires notice that the government will seek a form of enhanced penalty. Notice of that proposed action, however, reflects an aspect of due process unrelated to the necessity of proving each element of the offense. *See United States v. Raimondo,* 721 F.2d 476 (4th Cir.1983), *cert. denied,* 469 U.S. 837, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984).

In other settings, statutes permitting enhanced penalties have established the prosecution's burden of proof as a preponderance of the evidence. *See* 18 U.S. C. § 3575 (increased sentence for dangerous special offenders); *United States v. Palma,* 760 F.2d 475, 480 (3d Cir.1985) (under 18 U.S.C. § 3580(d), government must prove victim's loss for restitution purposes by a preponderance). *See also McMillan v. Pennsylvania,* [477] U.S. [79], [84], 106 S.Ct. 2411, 2416, 91 L.Ed. 67 (1986) (to impose mandatory minimum sentence state need only prove by preponderance that defendant possessed firearm).

The legislative history makes clear that Congress sought to make the government's burden of proof in criminal forfeitures the same as that in the civil realm. Such a provision is valid to the extent that the forfeiture proceeding occurs only after a conviction based on the constitutional standard. The statute, moreover, does not shift the burden of persuasion—it remains with the prosecution. Because the charge to the jury on forfeiture took place after the government had proved guilt beyond a reasonable doubt, we conclude that use of the preponderance standard only to establish the extent of the penalty withstands constitutional scrutiny.

816 F.2d at 471–476. (Footnotes omitted.)

The Court is persuaded by the well-reasoned opinion of *Sandini* and the Third Circuit. As such, the Court finds the rebuttable presumption of § 853(d) meets constitutional requirements for burdens of proof.

■ Since defendant was found guilty of violating 21 U.S.C. § 841(a) and 846, the rebuttable presumption of subsection (d) applies if the government establishes by a preponderance of the evidence that (1) the Red Road property was acquired by defendant Haro during the period of the offense, or within a reasonable period of time after such period; and (2) there was no likely source for the Red Road property other than the offense.

The Indictment charged that a conspiracy to distribute cocaine took place between on or about January 1, 1984, and on or about May 25, 1987. The jury found that defendant Haro was a member of this conspiracy. Furthermore, there is no dispute that the Red Road property was purchased during this time. Thus the Court finds the government has met its burden as to the first prong.

For a number of reasons, the Court also finds that the government has established that there was no likely source for the purchase of the property other than the cocaine conspiracy. First, the testimony showed that defendant Haro was only the nominal owner of the property and that the true owner was Orlando Estevez, the head of the cocaine ring. Second, all but $5,384.05 of the money used for the deposit and closing was traced to cash. Third, these cash payments were structured in amounts under $10,000 so as to conceal the transfer of a large amount of cash. Fourth, mortgage payments were made from an account opened with a bail check endorsed by Omar Estevez. Fifth, other mortgage payments were made by defendant Haro from a loan on the 95th Street property, which was purchased by defendant Haro in much the same way as the Red Road property. And sixth, defendant Haro's testimony as to the source of the cash bordered on perjury.

Defendant Haro's brief makes much of the argument that the government has not traced the cash in question to specific drug transactions. He also points out that the government has conceded that he made some of the mortgage payments on the property from his own money.

The Court agrees that the government has not linked the cash to any specific drug profits. The Court, however, does not find such a specific link necessary. Stepping back from the specific application of subsection (d) and turning to the wording of subsection (a)(2), the Court would point out that the property subject to forfeiture includes "any property used, or intended to be used, in any manner or part, to commit or facilitate the commission" of the unlawful distribution of cocaine. The evidence in this case established beyond a reasonable doubt that defendant Haro's role in the conspiracy was to conceal the Estevez drug profits by purchasing real estate in his own name when in fact the property belonged to the Estevez family. Thus the property in question was an actual tool of the cocaine distribution. The more the Estevezes were able to conceal their drug profits, the more the cocaine ring prospered. Defendant Haro's interest in the property was a mere front or sham. The fact that the government cannot link the cash payments to specific drug transactions does not serve to protect defendant Haro's illicit ownership rights against forfeiture of his interest. The purchase of the Red Road property in and of itself directly facilitated the drug conspiracy. No further financial link to the drug transaction is necessary under either the requirements of subsection (d) or subsection (a)(2).

The same reasoning applies to the fact that defendant Haro may have made mortgage payments out of his own money. These payments served no other purpose than to conceal the true ownership of property. They were simply an otherwise legal means by which defendant Haro facilitated, or intended to facilitate, an illegal end: the laundering of Estevez cocaine profits.[3]

### III. CONCLUSION

Based on the decision above, the Court finds that defendant Haro's financial inter-

---

**3.** The Court would add that under subsection (d), defendant Haro has not rebutted the presumptions established by the government. As stated previously, the Court found his testimony as to the source of the cash simply incredible and perhaps even perjurious.

est in the Red Road property was gained as a result of his role in the cocaine conspiracy. Accordingly, pursuant to the applicable provisions of 21 U.S.C. § 853, defendant Haro is hereby ORDERED to forfeit to the United States any financial interest in the Red Road property, as described in the forfeiture provisions of the Indictment.

## Court Appendix A

SOURCE OF PURCHASE FUNDS: $79,031.05
(plus assumed mortgage)

7000 S.W. 57th AVE.    CLOSING: NOV. 5, 1985    DEPOSIT: $16,000    CASH TO CLOSE: $63,031.05
(RED ROAD), MIAMI

| DATE | CHECK NO. | AMOUNT | ACCOUNT/BANK | SOURCE OF FUNDS | EXHIBITS |
|---|---|---|---|---|---|
| 8-8-85 | --- | $ 1,000 | Deposit paid to Riteway Realtors | CASH | 692 |
| 9-3-85 | #4875 | $ 8,000 | Haro P.A. Trust Account Intercontinental Bank | CASH | 632, 632a |
| 9-4-85 | #4876 | $ 7,000 | Haro P.A. Trust Account Intercontinental Bank | CASH | 632, 632b |
| 10-3-85 | Cashiers Check #18-04543 | $ 9,500 | Centrust Savings Bank | CASH | 676c, 676d, 678f |
| 11-1-85 | Cashiers Check #20393 | $ 8,347 | Total Bank | CASH | 677c, 677d, 678c |
| 11-1-85 | Cashiers Check #52810 | $ 9,800 | Intercontinental Bank 3363 S.W. 8th Street | CASH | 643, 643a, 678e |
| 11-5-85 | Cashiers Check #121008 | $35,384.05 | Continental National Bank | Check #112, drawn on account of Jose A. Haro - Maria I. Haro, ITF Jose G. Haro, Continental National Bank | 669, 678d, 660c, 669a |

TOTAL: $79,031.05

[GOVERNMENT EXHIBIT 701]

1478

*Court Appendix B*

**SCHEDULE OF DEPOSITS BY JOSE G. HARO**

**INTO THE ACCOUNT OF JOSE A. HARO - MARIA I. HARO, CONTINENTAL BANK**

**SEPTEMBER 3, 1985 through NOVEMBER 5, 1985**

| DATE | AMOUNT | REMARKS | EXHIBIT |
|------|--------|---------|---------|
| 9-20 | $ 5,000 | Check #1484 Haro ▮▮▮▮▮ Account[*] PA | 663 |
| 9-20 | $ 4,500 | Cash | 663 |
| 9-23 | $ 9,500 | Cash | 664 |
| 9-24 | $ 8,000 | Check #542 Haro Personal Account [Preceded by $8,000 Cash on 9-20] | 665 650, 651, 652 |
| 9-25 | $ 8,000 | Cash | 666 |

| | |
|---|---|
| Currency | $30,000 |
| Check | 5,000 |
| IN | $35,000 |

[GOVERNMENT EXHIBIT 702]

*[Blackout and handwriting in original]