UNITED STATES of America, Plaintiff–Appellee,

v.

Juan HERRERO; Jose Guillermo Haro; and Armando N. Martinez, Defendants–Appellants.

Nos. 88–2094, 88–2149 and 88–2378.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1989.

Decided Jan. 16, 1990.

**1516**

Eric J. Klumb and R. Jeffrey Wagner, Asst. U.S. Attys. (argued), Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Andrew Mishlove (argued), Milwaukee, Wis., for defendants-appellants.

Before WOOD, Jr., and COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Juan Herrero, Jose Guillermo Haro and Armando N. Martinez appeal their convictions for conspiracy to possess with intent to distribute and distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(2) and 18 U.S.C. § 2, interstate travel to promote drug trafficking in violation of 18 U.S.C. § 1952(a)(3) and § 2, and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[1] We affirm.

## I.
### Facts

Herrero, Haro and Martinez were indicted following an investigation of the Estevez drug conspiracy, headquartered in Miami, Florida, that was responsible for the distribution of large amounts of cocaine in the Milwaukee, Wisconsin, area in 1985 and 1986. Members of the Estevez conspiracy purchased cocaine in Miami, transported it to Milwaukee and returned the proceeds of the sales to its Miami base. The three defendants in this case had varied responsibilities in the conspiracy. Juan Herrero supplied cocaine to the conspiracy, and Armando Martinez transported the drugs from Miami to the Milwaukee distribution network and returned the drug sale proceeds to Miami. Jose Haro, a Miami attorney, laundered the conspiracy's proceeds through the purchase of real estate in the Miami area for the conspiracy.

### A.
### THE ROLE OF JUAN HERRERO IN THE CONSPIRACY'S COCAINE SUPPLY

Orlando Estevez, the kingpin of the conspiracy, became romantically involved with Elena Gonzales, and as the relationship developed, he allowed Gonzales to play a

---

1. Another defendant, Melvin Martin, was tried and convicted with Haro, Herrero and Mar-tinez. However, Martin died prior to sentencing.

prominent part in the drug enterprise, including being the only person in the conspiracy who had access to the drug conspiracy's money supply. At this time Estevez revealed to Gonzales that he was a major drug distributor in the Milwaukee, Wisconsin, area.

At trial Gonzales provided much of the evidence detailing Juan Herrero's responsibility as a major supplier of cocaine for the drug conspiracy.

Gonzalez related two incidents in which Juan Herrero, known to her as "Gallego," supplied cocaine to the Estevez conspiracy. The first of these incidents occurred in March 1986, shortly after Gonzalez became involved with Estevez. Gonzalez saw Herrero enter the Estevez house on 95th Street in Miami with a gym bag full of unknown contents. Herrero then departed from the house and went into the garage to meet with Orlando Estevez. Gonzalez later observed that the contents of Herrero's gym bag had shrunk. Following Herrero's departure, Orlando Estevez revealed to Gonzalez that "Gallego is my supplier from whom I buy this to take up to Milwaukee."

The second instance of a cocaine sale from Herrero to Orlando Estevez that Gonzalez recounted took place in mid-June 1986. At that time Gonzalez observed Herrero arrive at the 95th Street house in Miami with a kilo of cocaine. She saw Orlando Estevez slit the bag containing the cocaine and sample the drug. About a week later Herrero returned to the 95th Street residence and once again entered the garage with Orlando Estevez. Gonzalez testified that shortly thereafter she walked into the garage and noticed that Orlando Estevez was handing Herrero a box that contained $500,000 in cash. Herrero left and took the box containing the money with him. After Herrero's departure, Orlando Estevez told Gonzalez that he had given Herrero the money to purchase coke for his next shipment.

A few days thereafter, while Gonzalez was shopping, she received a message from Orlando Estevez on her pager. When she returned Orlando's call he asked her to take $50,000 from the Estevez' cash supply and bring it to the 95th Street house immediately. Gonzalez, upon arriving at the 95th Street house with the $50,000, observed Orlando Estevez with Herrero. Gonzalez gave the money to Orlando Estevez and went to another room in the house. Approximately 20 minutes later, after Herrero departed, Orlando Estevez told Gonzalez, in Gonzalez's words, that "Gallego [Herrero] had returned to [Estevez] and told [Estevez] that there weren't (sic) exactly $500,000 there and that (sic) was money missing, and that the money had to be completed for the purchase of the kilos." Later that night Gonzalez went into the garage of the 95th Street residence, saw a large amount of cocaine and observed Orlando Estevez securing the cocaine packages with a grey duct tape.

Other evidence introduced at trial supported the conclusion that Herrero was a source of cocaine for the Estevez drug enterprise. In late April 1986, Larry Jackman, an individual who assisted in the distribution phases of the Estevez drug conspiracy, recounted a conversation he overheard between Orlando Estevez and co-conspirator Amado Leon.[2] This conversation took place in Miami when Jackman, Estevez and Leon were loading a car with cocaine for transportation to Wisconsin, and Leon, in Jackman's words, "said that he [Leon] went and arranged the purchase from Gallego." Herrero's involvement in the conspiracy was further corroborated through the discovery of six of Herrero's fingerprints on three of the kilo bags of cocaine obtained in the July 11, 1986, search of a house the Estevezes had rented in Oak Creek, Wisconsin, a Milwaukee suburb.

## B.

### THE ROLE OF ARMANDO MARTINEZ IN THE TRANSPORTATION AND DISTRIBUTION OF COCAINE

After the Estevezes purchased cocaine in Miami, the conspirators conveyed the drugs

---

**2.** Amado Leon was convicted of one count of conspiracy to distribute cocaine and three counts of possession of cocaine with intent to distribute. *United States v. Moya–Gomez,* 860 F.2d 706, 755 (7th Cir.1988).

to Milwaukee in automobiles. In January and February 1986, Celestino Estevez, Orlando's father, transported shipments of between 10 and 12 kilograms of cocaine each to Milwaukee from Florida. Later the defendant Armando Martinez became involved in the conspiracy's drug transportation process.

Martinez initially drove from Miami to Milwaukee in early April 1986 when he returned an automobile rented in Milwaukee. At this time he obtained a Wisconsin driver's license and listed his address as the Flagg Street residence in the city of Milwaukee, Wisconsin, from which the Estevezes had conducted cocaine distribution operations from July to October 1985.

In late April of 1986 Martinez transported cocaine from Miami to Milwaukee in the automobile that Orlando Estevez, Amado Leon and Larry Jackman had loaded with 10 to 12 kilos of cocaine. In mid-May 1986 Martinez again drove to Milwaukee and received $5,000 for transporting 23 to 25 kilos of cocaine. In late June of 1986, Martinez and his family conveyed another shipment of drugs from Miami to Milwaukee. This shipment consisted of more cocaine that Estevez had received from Herrero and again Martinez was paid $5,000.

After the cocaine arrived in Milwaukee, the Estevez' co-conspirators distributed the cocaine from several different rented houses in the Milwaukee area. Various members of the Estevez conspiracy then returned to the Estevez' conspiracy's Miami

headquarters with the proceeds from the Milwaukee cocaine sales. Celestino Estevez transported cash shipments from Milwaukee to Florida in February and March 1986, Orlando Estevez, together with Elena Gonzalez, returned to Miami with shipments in April and June 1986, while Armando Martinez transported another cash shipment in April 1986. In May of 1986 an individual identified as "Abba" took a suitcase full of cash to Florida via commercial air transportation.[3]

## C.

### JOSE HARO'S ROLE IN THE LAUNDERING OF PROCEEDS FROM COCAINE DISTRIBUTION

Orlando Estevez desired to utilize the proceeds he obtained from his cocaine operations to purchase real estate in the Miami area and had Jose Haro, a Miami attorney, purchase the properties for him. These properties were purchased in Haro's name through the utilization of methods that generally involved the conversion of cash in amounts of less than $10,000 into bank cashier's checks. The significance of the $10,000 amount lies in the fact that banks were required to file currency transaction reports (CTR's) with the Internal Revenue Service for any transactions of more than $10,000.[4] Because Haro challenges his conviction for conspiracy to possess with intent to distribute and distribute cocaine on the basis of insufficient evidence, we

---

**3.** Orlando Estevez accompanied "Abba" on this airplane flight.

**4.** 31 U.S.C. § 5313(a) states in relevant part: "When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency ... in an amount ... prescribe[d] by regulation, the institution and any other participant in the transaction the Secretary may prescribe, shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made." 31 C.F.R. § 103.22(a)(1986), in effect at the time, provided in relevant part:
"(a) Each financial institution shall file a report of each deposit, withdrawal, exchange of

currency or other payment or transfer by, through or to such financial institution, which involves a transaction in currency of more than $10,000. Such report shall be made on forms prescribed by the Secretary, and all information called for in the forms shall be furnished."
During the September 1985 to August 1986 period Haro engaged in these activities, it was not specifically criminal to "structure" transactions in this manner to avoid the filing of a CTR. But, as we noted in *United States v. Bucey*, 876 F.2d 1297, 1306 n. 17 (7th Cir.1989), the Money Laundering Control Act of 1986, enacted October 27, 1986, now "prohibits individual bank customers from structuring transactions to circumvent CTR filing requirements."

proceed to consider the evidence concerning Haro's involvement in the purchase of properties for the Estevezes.

### 1.

### The 95th Street House

The first of the properties that Haro acquired for Orlando Estevez was a house located at 11821 S.W. 95th Street, Miami, Florida (hereinafter "95th Street"). On September 15, 1985, Orlando Estevez and a realtor agreed to purchase this residence from Howard Copley, the owner, for $120,000. However, after the purchase had been agreed to, the realtor contacted Copley and told him that the purchaser was to be listed under the name of "Jose Guillermo Haro and/or assigns." This property, as well as the properties on 97th Street and on Red Road discussed subsequently, were titled to Haro as a single man although he was married at the time the property was purchased. At the October 1985 closing, Attorney Haro paid for the house with two checks from his attorney trust account in the amounts of $35,522.60 and $12,600 respectively, and nine cashier's checks in various amounts below the $10,000 statutory minimum level for the filing of a currency transaction report (CTR). These cashier's checks had been issued from banks in the Miami area on several different dates between September 17, 1985, and October 1, 1985. Haro paid Copley, the seller, for all but $1,200 of the $124,122.60 purchase price with funds drawn from cash sources.

In January 1986, Orlando Estevez, his father Celestino Estevez, his mother, Romelia Estevez and his two brothers, Oswaldo and Omar Estevez, together with Orlando and Omar's wives, began to move into the 95th Street house. During this month Orlando Estevez told Evelio Pinto and Larry Jackman, two persons involved in his cocaine operation, as well as Pinto's wife, Maria, that he had purchased this house for his parents. In the same month the Pintos and Jackman further observed that the Estevezes were making major improvements on the property including the installation of a swimming pool.

On January 30, 1986, Haro borrowed $70,000 against the 95th Street property and deposited the proceeds in an account at Ponce de Leon Federal Savings & Loan Association in Miami.

### 2.

### The Red Road Property

At about the same time Haro was purchasing the 95th Street house for Orlando Estevez, Estevez also became interested in purchasing a lot in a residential area located at 9000 S.W. 57th Avenue in Miami, Florida (hereinafter "Red Road"). Orlando Estevez told both Elena Gonzalez and Larry Jackman that this was where he intended to build his "dream home." Estevez further told Evelio Pinto, Maria Pinto and Elena Gonzalez that this property was in Jose Haro's name. With respect to this real estate, Estevez also told Maria Pinto that the purpose of this practice was to avoid problems because Orlando Estevez had too many assets listed in his own name.

Jose Haro purchased the Red Road property through monetary manipulations quite similar to, but somewhat more involved than, those he utilized to purchase the 95th Street property. Haro made a $16,000 down payment on the property from cash sources.

At the November 1985 closing Haro presented the property owner with $53,031.05 in the form of four cashier's checks in amounts of $9,500, $8,347, $9,800 and $35,384.05. The ultimate source of all but $5,384.05 of the amount paid for the Red Road property at closing was cash. At the time of closing Haro also assumed an $89,302.49 mortgage on the Red Road property.

At this time Haro also opened an account at Flagler Federal Savings in Miami, the financial institution that owned the mortgage on the Red Road property. Haro's initial deposit into his Flagler account was a $50,000 bail refund check that was issued from the Dade County Circuit Court Clerk and that had been endorsed to Haro on

October 2, 1985, from Omar Estevez.[5] Of this $50,000 amount, $10,000 was used to make monthly mortgage payments on the Red Road property through March 1986 and to pay other expenses related to the Red Road property.[6] Mortgage payments on the Red Road property and the subsequently purchased 97th Street property were made from the Flagler account after money was transferred from another account in a different savings & loan containing proceeds from the mortgage placed on the 95th Street house.

### 3.

### The 97th Street House

Soon after Orlando Estevez acquired the 95th Street house and the Red Road property through the actions of Jose Haro, Orlando Estevez sought to purchase another house at 11712 S.W. 97th Street, located in the same land development as the 95th Street house. On December 30, 1985, and January 20, 1986, Orlando and Susanna Estevez made cash deposits in the amounts of $800 (December 30, 1985) and $9,200 (January 20, 1986) to the real estate company selling the house.[7] In January 1986 Orlando Estevez stated in the presence of Evelio and Maria Pinto that he was purchasing the 97th Street house for Susanna Estevez and himself. On February 16, 1986, Jose Haro phoned the real estate company and stated that he would be handling the closing. Then, in mid-March 1986, Orlando Estevez advised the real estate company that he could not buy the house but that Jose Haro would. Orlando was given a sales contract, presumably to deliver to Haro. On March 14, 1986, Haro tendered a $10,000 deposit check for the residence from the proceeds of the mortgage that Haro had on the 95th Street property.

Delays in the closing on the 97th Street property upset Estevez, and on May 27, 1986, while in Milwaukee, he called Haro in Miami to express his displeasure with the delays in the closing. A series of meetings were held between Haro, Orlando Estevez and Elena Gonzalez concerning the 97th Street property commencing in June of 1986. At the first meeting Elena Gonzalez signed a rental agreement for the 97th Street property although she never made a rental payment. At the next meeting between Orlando Estevez, Gonzalez and Haro, Orlando insisted that Haro proceed with the purchase and pay cash for the property. Haro noted his reluctance because he stated it might cause problems in the future. Nonetheless, Haro ultimately agreed to comply with Estevez' request. At this same meeting Haro displayed to Estevez a bank statement for an account in his name that contained some of Estevez' money. At this time Haro also advised Estevez that he would need $20,000 in cash to complete the 97th Street purchase. A third meeting was held between Orlando Estevez, Gonzalez and Haro prior to the closing. At this meeting Orlando handed $20,000 in cash to Haro. Elena Gonzalez testified that Haro told Orlando that he needed to have a few days to arrange for cashier's checks in amounts of less than $10,000 to avoid arousing the attention of the IRS.

Prior to the August 19, 1986, closing, Haro obtained cashier's checks from various banks for the purchase of the house. At the August 19, 1986, closing, these cashier's checks, together with a $267.28 cash payment from Jose Haro, were given to the realty company to satisfy the house's $124,-092.28 purchase price. On the closing date, Orlando Estevez picked up the house keys for the 97th Street house from the real estate company.

### 4.

### Events Involving Haro Before And At The Time Of The Three Real Estate Transactions

Before and during the time that Haro purchased the properties for Orlando Este-

---

**5.** Haro's involvement in the purchase of this bail check is noted in § I–C–4, *infra*.

**6.** The remaining $40,000 from the bail check was withdrawn from the account, and its disposition is unknown.

**7.** At that time Susanna Estevez was married to Orlando Estevez.

vez, Haro became aware of certain facts relevant to the Estevezes' cocaine trafficking. First, in April 1985, Haro assisted the Estevezes in acquiring a cashier's check with $50,000 in cash to satisfy a bail requirement placed upon Omar Estevez in relationship to a Miami cocaine trafficking charge. Further, in October 1985, while Haro was in the midst of purchasing the 95th Street and Red Road properties and prior to the date he was purchasing the 97th Street property, Agent Robert Hartman of the Milwaukee, Wisconsin, office of the Drug Enforcement Administration traveled to Miami in an attempt to contact Orlando Estevez. Following Hartman's unsuccessful attempts to speak with Orlando Estevez at the apartment where the Estevezes were living at the time, Hartman received a call from Jose Haro on October 31, 1985, in which Haro stated that he represented Orlando Estevez. Hartman told Haro that he wanted to talk to Orlando Estevez about suspected drug activity involving a vehicle in Milwaukee, and Haro arranged to have Orlando Estevez contact Hartman.

### 5.

### Meetings Between Haro And Elena Gonzalez Following Orlando Estevez's Arrest

The Estevez drug conspiracy began to run into difficulties in the summer of 1986. On June 30, 1986, law enforcement agents searched two Milwaukee area houses the Estevez conspiracy rented and seized cash, drugs, firearms and ledgers utilized in the Milwaukee area drug transactions. This search was followed with a subsequent search of one of the houses on July 11, 1986, that turned up additional cocaine. Then, on August 27, 1986, less than nine days after the closing on the 97th Street house, the 95th Street house in Miami was searched. As a result of this search, an arsenal of weapons, address books and money were seized. At the time of the 95th Street search, Orlando Estevez and Elena Gonzalez were arrested at the residence on drug charges.

Several meetings took place between Haro, Elena Gonzalez and various Estevez family members following Orlando Estevez's arrest. On August 28, 1986, one day after Orlando Estevez' arrest, Attorney Haro met with Elena Gonzalez, Romelia Estevez (Orlando's mother) and Lourdes Estevez (Omar Estevez's wife) in his law office. The women advised Haro that Orlando had been arrested and needed Haro's help in arranging for his bail. Haro explained to the women that he could not do that because it would be difficult to explain the production of cash for bail in light of the recent purchase of the 97th Street residence and the arms length "landlord-tenant" relationship that supposedly existed between Haro and the Estevezes. Gonzalez showed Haro a copy of the original Estevez indictment that included a request for forfeiture of the 95th Street house. Haro told them that they should not worry about this because no one had contacted him (Haro).

During a second meeting Haro, Gonzalez, Romelia Estevez and Lourdes Estevez, discussed the issue of altering a corporate document that Haro prepared. The parties sought to ensure that the document's listing of Orlando Estevez' position in the corporation would corroborate the statement that Orlando Estevez had made at the time of his bail proceedings. Haro stated that changes could be made along these lines. At that meeting Haro also displayed a bank statement reflecting that there was sufficient money left in an account to make the payments on the Red Road and 95th Street properties.

The next time Elena Gonzalez met with Haro, Haro told Gonzalez that Haro "was shocked by the whole thing about Orlando being charged with a [Continuing Criminal Enterprise] charge" and further stated "that he knew that Orlando was in the drug business but ... did not realize the extent of it," and had been extremely surprised by the extent of Estevez' involvement. She also noted that Haro became quite emotional about what was happening to Orlando and stated that he loved Orlando like a brother and "if [Haro] had done what he had done, it was to see if he

[could] attempt to get Orlando out of this business."

Gonzalez had another meeting with Haro following the issuance of the superseding indictment that included a request for forfeiture of the 97th Street house. Haro told Gonzalez and Lourdes Estevez that no one had contacted him, that "all my papers on the properties and houses are in order [and] I can't see why or how they can accuse me of this."

Prior to Gonzalez' October 27, 1986, arraignment, Haro visited the 95th Street house. He was shocked when he observed the extensive alterations the Estevezes had made to the property, including the installation of a swimming pool. He related that there was no way in which one could explain the fact that renters had made such extensive renovations on properties. Haro suggested that the parties enter into lease agreements with him with an option to purchase. Haro prepared a new lease document for Omar Estevez to sign for the 95th Street property, and Omar's wife, Lourdes, obtained Omar's signature while Omar was in hiding. Elena Gonzalez and Lourdes Estevez went to Haro's office, where Lourdes Estevez handed Haro the previously backdated 95th Street lease he had prepared containing the option to buy with Omar Estevez' signature now inscribed thereon. At this same time, while conferring with Haro, Elena Gonzalez, at Haro's direction, also signed a backdated lease containing an option to purchase the 97th Street house.

## II.

### JENCKS ACT—18 U.S.C. § 3500

■ The Jencks Act compels the government's production of pre-trial statements that a government witness has signed or otherwise adopted or approved relevant to the subject matter upon which the witness has testified. 18 U.S.C. § 3500(b). The Act defines a statement, in relevant part, as "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1) "This definition clearly was intended by Congress to describe material that could

reliably and fairly be used to impeach the testimony of a witness." *United States v. Allen*, 798 F.2d 985, 994 (7th Cir.1986). Defendants Herrero, Haro and Martinez contend that the district court erred in concluding that notes federal agents took during two pre-trial interviews of government witness, Elena Gonzalez, were not statements for purposes of the Jencks Act and in reaching this determination without conducting an *in camera* inspection of the involved materials.

" 'The district court is vested with broad discretion' " in determining whether a particular document is considered a producible statement within the parameters of the Jencks Act, and " '[i]ts findings in this respect may be disturbed on appeal only if they are clearly erroneous.' " *Allen*, 798 F.2d at 994 (quoting *United States v. O'Brien*, 444 F.2d 1082, 1087 (7th Cir. 1971)). In this case, the critical issue is whether the district court's determination was proper when finding that Gonzalez had not "adopted or approved" the notes agents took during her pre-trial interviews.

The district court during trial ruled on the Jencks Act issue on two separate occasions. Initially, Haro's attorney briefly cross-examined Gonzalez concerning the fact that the government interviewed her on several occasions, but failed to elicit from Gonzalez any information concerning her adoption or approval of any statements contained in the agents' notes. The trial court then announced its rejection of Haro's Jencks Act request to produce on the ground that Haro's cross-examination of Gonzalez had failed to produce convincing evidence that Gonzalez had either adopted or approved the questioned statement.

Following the court's initial determination, Haro's attorney conducted a significantly more extensive cross-examination of Gonzalez concerning her possible "adoption or approval" of the notes federal agents took during her pre-trial interviews. With respect to the first investigatory interview, that took place on June 12, 1987, the record contains the following colloquy:

"Q: (Rebekah J. Poston, Haro's Attorney) Did you at any time, were you at any time asked to repeat any of your statements to be certain they had them down correctly?

A: (Elena Gonzalez) Yes.

Q: And they would do that, would they not, because it was important to them that when they were writing down your statements that they had it correct according to what you said?

A: That's true.

Q: And there would be times, would there not, when you would be answering their questions, that they didn't understand, you would explain to them?

A: Yes.

Q: And from [time] to time you may have even explained things to them more than once, would that not be correct?

A: Yes.

Q: And there was an explanation back and forth between you and the agent to be sure that you understood each other?

A: That's correct."

With respect to the September 9 interview, the following cross-examination took place:

"Q: (Rebekah Poston, Haro's Attorney) Who was taking notes at the second meeting? ·

A: (Elena Gonzalez) Mr. Hartman [a DEA Agent].

Q: And from time to time when he wrote things down would he read them back to you or discuss them with you to be sure they were accurate?

A: Yes.

 * * * * * *

Q: And the notes that Mr. Hartman was taking down filled quite a few pages didn't they?

A: I imagine so.

Q: (By the Court) Did you ever take them and look at them?

A: No sir.

Q: (By the Court) Did he ever read them back to you?

A: No.

Q: (By Ms. Poston) Well, just before you said that he would write things down and then check with you to be certain that they were accurate; are you now changing your mind?

A: No. He just asked questions and I would say things to be certain of what I had said.

Q: So in other words, you were—was it pretty much your volunteering everything, or was it a mixture of your telling them and them asking you?

A: It was a mixture of both.

Q: And there would be times that Mr. Hartman would write things, would read back to you what he had written to be sure he was accurate, that's all my question is?

A: Yes.

 * * * * * *

Q: Ms. Gonzalez, earlier in the questioning I asked you whether or not you made a point to check what was being written down regarding your statements and you said that you did?

A: Excuse me. They would ask me to be sure what they were writing down. I would not question what they were writing down.

Q: They were repeating back to be certain that it was accurate?

A: Certain parts, that is correct.

Q: (By the Court) Did they repeat back all of it?

A: No sir."

Following this cross-examination, Haro's attorney again sought to obtain the agents' notes on the basis of Gonzalez' "adoption or approval" of the notes allegedly reflected in this cross-examination. The court rejected counsel's request without the benefit of an *in camera* inspection of the documents. The court stated:

"Well, I was convinced after I listened to her [Gonzalez'] testimony they were not statements that were approved by the witness pursuant to the rule, and even though she did say that she on occasion would repeat it and he would read it back to her, and so forth, I don't think that constitutes an approval of a quote, state-

ment, as the case law reads, so that I am not going to order that on my present state of the knowledge that the notes be turned over."

In *Goldberg v. United States,* 425 U.S. 94, 110 n. 19, 96 S.Ct. 1338, 1348 n. 19, 47 L.Ed.2d 603 (1976), the Supreme Court made the following observation concerning factual situations of this sort:

"Every witness interview will, of course, involve conversation between the lawyer and the witness, and the lawyer will necessarily inquire of the witness to be certain that he has correctly understood what the witness has said. Such discussions of the general substance of what the witness has said do not constitute adoption or approval of the lawyer's notes within § 3500(e)(1), which is satisfied only when the witness has 'signed or otherwise adopted or approved' what the lawyer has written. This requirement is clearly not met when the lawyer does not read back, or the witness does not read, what the lawyer has written."

In light of the failure of the defendants to demonstrate anything more than informal give and take between agent and witness concerning the general substance of her position and the failure to demonstrate the witness' adoption of the statement as her own, the district court certainly did not commit "clear error" in determining that the agents' notes failed to constitute Jencks Act statements.

■ With respect to the propriety of a Jencks Act determination without the benefit of *in camera* inspection of the requested documents, we held in *Allen* that:

"While an *in camera* inspection is not statutorily mandated for a determination of whether a disputed document is a Jencks Act statement, the presumption is that an *in camera* hearing is needed to inspect the document. That presumption can be overcome by an articulation on the record as to why an examination of the document was unnecessary or pragmatically impossible."

798 F.2d at 995. In this case Haro's cross-examination of Gonzalez resulted in the reception of an extensive body of extrinsic evidence concerning the agents' notes. As noted previously, the evidence clearly establishes that the interviews reflected nothing other than informal exchanges between Gonzalez and her interviewers concerning the general substance of her story rather than a statement that meets the required "adoption or approval" test of the interviewers' notes necessary to designate them as "material that could reliably and fairly be used to impeach [Gonzalez'] testimony." *Allen,* 798 F.2d at 994. Because the extrinsic evidence in this case concerning the preparation of the interviewers' notes so clearly established that they did not fall within the definition of Jencks Act statements, there was no need to conduct an *in camera* inspection of the notes themselves. Thus, we agree with the district court and hold that the court properly determined that the material in the agents' notes concerning Gonzalez' pre-trial interviews did not contain statements subject to production under the Jencks Act.

### III.

### *CONFIDENTIAL INFORMANT PRIVILEGE*

During Juan Herrero's detention hearing an FBI agent was asked a question which prompted a government objection and a request for a sidebar conference. During the sidebar conference between the judge, the government's attorneys and Herrero's attorney, the government represented that an answer to Herrero's question would reveal the identity of an individual whom the FBI agent had interviewed with a promise of confidentiality. This particular informant in this factual situation had been promised that both the fact that the interview had taken place and the substance of the interview would not be disclosed to third parties unless the informant made statements which tended to exculpate a criminal defendant. In the course of the sidebar conference the government attorneys disclosed the identity of the informant and the fact that the informant had made statements concerning Herrero's participation in the conspiracy. In response to a government request, the court issued a pro-

tective order forbidding Herrero's counsel from revealing to Herrero the matters discussed at the sidebar. In particular, the protective order forbade revelation of either the fact that the government interviewed the informant or the substance of the interview. Herrero alleges that the district court erred in issuing this protective order.

We recently discussed the history and policies underlying the confidential informant privilege in *Dole v. Local 1942, IBEW,* 870 F.2d 368, 372 (7th Cir.1989):

"The doctrine of the informer's privilege is not a recent phenomenon, having its roots in the English common law. The underlying concern of the doctrine is the common-sense notion that individuals who offer their assistance to a government investigation may later be targeted for reprisal from those upset by the investigation. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the responsibility of citizens to cooperate with law enforcement officials and, by providing anonymity, encourages them to assume this responsibility. With the threat of reprisal real and unprotected against, well-intentioned citizens may hesitate or decline to assist the government in tracking down wrongdoers.... The most effective means of protection, and by derivation the most effective means of fostering citizen cooperation, is bestowing anonymity on the informant, thus maintaining the status of the informant's strategic position and also encouraging others similarly situated who have not yet offered their assistance."

(Citations omitted). We went on to discuss the matters a district court must consider in determining whether the privilege applies:

"When asserting the privilege the government need not make a threshold showing that reprisal or retaliation is likely, because of the significant policy consideration behind the privilege, as well as the difficulty of such proof. Rather, the government is granted the privilege as of right. But the privilege is

qualified; it yields when the identification of the informant or of a communication is essential to a balanced measure of the issues and the fair administration of justice. *Roviaro* [*v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957)] ("Where the disclosure of the informer's identity, or the contents of the communication is relevant and helpful to the defense of an accused, the privilege must give way"). The party opposing the privilege may overcome it upon showing his need for the information outweighs the government's entitlement to the privilege. The district judge must take a balanced approach and in the end decide whether the party opposing the privilege has credible need for the information in order to defend itself in the action—a need greater than the important policy consideration underlying the privilege. The privilege will not yield to permit a mere fishing expedition, nor upon bare speculation that the information may possibly prove useful.

*Local 1942,* 870 F.2d at 372–73 (citations omitted).

■■■ Herrero asserts that the government waived the confidential informant privilege when it disclosed the informer's identity and the subject matter of his statements to Herrero's counsel during the sidebar. The informant privilege covers both the informant's identity and the contents of his communications with the government if those contents tend to reveal the informant's identity. *See Roviaro v. United States,* 353 U.S. 53, 59–60, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957). It is true that "once the identity of the informer has been disclosed *to those who would have cause to resent the communication,* the privilege is no longer applicable," *Roviaro v. United States,* 353 U.S. at 60, 77 S.Ct. at 627 (emphasis added), as "the purpose of the privilege is to maintain the Government's channels of communication by shielding the identity of an informer from those who would have cause to resent his conduct." *Id.* at 60 n. 8, 77 S.Ct. at 627 n. 8. When an attorney takes the oath to

practice law he becomes an officer of the court, as well as an advocate, and is thus bound to uphold and abide by the orders and rulings of the court under threat of serious sanction. We are not of the opinion that limited, circumscribed disclosure of an informant's identity and/or the substance of the informant's statements to a criminal defendant's counsel during trial is, in itself, disclosure to one "who would have cause to resent [the informant's] conduct." *Id.* at 60 n. 8, 77 S.Ct. at 627 n. 8. It is the defendant, in particular, and not his legal representative, who has a personal stake in the informant's identity and information and who would likely resent these actions. Herrero appropriately notes that an attorney's duty to provide an adequate defense for his client would ordinarily require that the attorney share this information with his client, and that usually is the accepted fact, but that is not always the case as in this factual scenario. This is precisely the reason the protective order directing counsel not to disclose the identity of the informant was necessary. If the court had not forbidden Herrero's attorney from disclosing the information to Herrero revealed in the sidebar conference, a waiver of the confidential informant privilege would obviously have resulted.[8]

■ Herrero also contends that the protective order's restriction upon attorney-client communications infringed upon his rights to due process of law and effective assistance of counsel. Because it is a ridiculous argument, we have difficulty conceiving how an attorney's knowledge of privileged information impairs his client's defense, and, in particular, when it concerns a witness who did not even testify and thus offered no evidence against the defendant. As the government notes, under the terms of the protective order Herrero and his attorney remained free even to call the informant as a witness if they desired. The only requirements of the protective order were that Herrero's attorney refrain from disclosing to the defendant or anyone the informant's identity, and the fact that the informant had spoken with the government as well as the substance of his conversation with the government. Herrero has failed to establish that his rights to due process of law or to effective assistance of counsel were impaired as a result of the district court's protective order.

■ Going beyond his attack on the protective order, Herrero additionally contends that due process requires disclosure of the confidential informant's statement and identity. In *Roviaro* the Supreme Court observed that "Where the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro,* 353 U.S. at 60–61, 77 S.Ct. at 627–28. The Supreme Court went on to state that:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

*Id.* at 62, 77 S.Ct. at 628–29.

Herrero alleges a number of different areas relevant to his case upon which the informer might have spoken with the government. The difficulty with his position is that it is most likely that any information the informer would have provided and which Herrero now seeks, would, in fact, have damaged, rather than assisted, Herrero. Even more significantly, the fact that the informer was never called as a witness at trial means that the information

---

**8.** We would note that the government might well have avoided the need for a protective order if it had utilized appropriate care and refrained from disclosing the informant's identity to Herrero's attorney. In a very real sense, the district court was called upon to resolve an unnecessary legal issue as the result of the government's needless disclosure to Herrero's attorney of the informant's identity.

provided the government was not relevant to the government's case nor would it have been helpful for impeachment purposes. In view of the information being irrelevant and/or damaging to Herrero's defense, we are convinced that Herrero's interest in disclosure of the informant's identity and statements did not outweigh the "public interest in protecting the flow of information" that underlies the informer's privilege. The public interest in non-disclosure is especially strong because the violent and clandestine nature of drug conspiracies results in serious danger, ofttimes even death, to a confidential informant if his cover is broken. We are convinced that the district court did not commit error in issuing its protective order preserving the confidential informant privilege in this matter.

## IV.

### CO–CONSPIRATOR HEARSAY—FEDERAL RULE OF EVIDENCE 801(d)(2)(E)

Herrero asserts that two statements of the conspiracy's kingpin, Orlando Estevez, admitted as statements of co-conspirators under Federal Rule of Evidence 801(d)(2)(E),[9] should have been excluded as inadmissible hearsay.

In the initial statement in March 1986, Orlando Estevez spoke with Elena Gonzalez after Gonzalez had observed Herrero entering the Estevez residence with what appeared to be a full gym bag, meeting with Orlando Estevez in the garage and leaving the dwelling with the same bag's contents greatly depleted. Following Herrero's departure, Orlando Estevez apologized to Gonzalez for taking so long and went on to state in Gonzalez' words "Gallego [Herrero] is my supplier from whom I buy this to take up to Milwaukee." The second statement occurred in June 1986, after Gonzalez had taken $50,000 out of

Orlando Estevez' cash supply at Estevez' request. Approximately 20 minutes after delivering the cash Orlando told Gonzalez, again in her words, that "Gallego [Herrero] had returned to [Estevez] and told [Estevez] that there weren't (sic) exactly $500,-000 there and that [there] was money missing, and that the money had to be completed for the purchase of the kilos."

"In order to admit evidence under [Federal Rule of Evidence 801(d)(2)(E) ], the district court must find, by a preponderance of the evidence, that: (1) the declarant and the defendant were members of a conspiracy; (2) when the hearsay statement was made; and (3) that the statement was in furtherance of the conspiracy." *United States v. D'Antoni*, 874 F.2d 1214, 1217 (7th Cir.1989). "We disturb the district court's finding that these requirements are met only if it is clearly erroneous." *United States v. Van Daal Wyk*, 840 F.2d 494, 496 (7th Cir.1988). Herrero challenges the district court's decision to admit these statements on the ground that the statements were not "in furtherance" of the conspiracy.

In *Garlington v. O'Leary*, we recently considered the scope of the "in furtherance" element of the co-conspirator exception to the hearsay rule. We observed:

"A coconspirator's statement satisfies the 'in furtherance' element of Rule 801(d)(2)(E) when the statement is 'part of the information flow between conspirator؛ intended to help each perform his role.' *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir.1988). Statements that further the objectives of a conspiracy can take many forms, including statements made to recruit potential coconspirators, *see United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987); statements seeking to control damage to an ongoing con-

---

**9.** Federal Rule of Evidence 801(d)(2)(E) provides:

"(d) Statements which are not hearsay. A statement is not hearsay if—

\* \* \* \* \* \*

(2) Admission by party-opponent. The statement is offered against a party and is

\* \* \* \* \* \*

(E) a statement by a co-conspirator of a party during the course and in furtherance of a conspiracy."

spiracy, *see Van Daal Wyk*, 840 F.2d at 499, statements made to keep coconspirators advised as to the progress of the conspiracy, *see United States v. Potts*, 840 F.2d 368, 371 (7th Cir.1987); and statements made in an attempt to conceal the criminal objectives of the conspiracy, *see United States v. Kaden*, 819 F.2d 813, 820 (7th Cir.1987); *United States v. Xheka*, 704 F.2d 974, 985–86 (7th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983)...."

*Garlington v. O'Leary*, 879 F.2d 277, 283–84 (7th Cir.1989).

■ " '[W]hether a particular statement tends to advance the objectives of the conspiracy can only be determined by examination of the context in which it is made,' " *Garlington*, 879 F.2d at 284 (quoting J. Weinstein & M. Berger, Weinstein's Evidence § 801(d)(2)(E)[1] at 80–240 to –241 (footnotes omitted)), and, in the milieu of the developing relationship between Estevez and Gonzalez, Estevez' March 1986 statement concerning Herrero's role as an Estevez drug supplier may be seen as a "statement[ ] made to recruit [a] potential coconspirator[ ]", *Garlington*, 879 F.2d at 283, through familiarization with the various members of the conspiracy, and, thus, as " 'part of the information flow between conspirators intended to help each perform his role.' " *Id.* (quoting *Van Daal Wyk*, 840 F.2d at 499).

■ With respect to Estevez' June 1986 statement, Gonzalez' act of delivering $50,-000 to Estevez at Estevez' request in that month clearly establishes that she had become a trusted member of his drug distribution operation. After the money had been delivered to Herrero, Estevez made the challenged statement that explained to Gonzalez why Estevez had her retrieve the $50,000. "A coconspirator's statement satisfies the 'in furtherance' element ... when the statement is 'part of the information flow between conspirators intended to help each perform his role.' " *Garlington*, 879 F.2d at 283 (quoting *Van Daal Wyk*, 840 F.2d at 499). "[S]tatements made to keep coconspirators advised as to the progress of the conspiracy," *Garlington*, 879 F.2d at

283, are clear examples of declarations that further a conspiracy's objective. Estevez' statements to Gonzalez in March and June 1986 informed her (a co-conspirator) not only about the status of the drug conspiracy's most recent cocaine purchase transaction (June 1986), but also the area (Milwaukee) where Estevez was doing business (March 1986). These statements, as well as the statement directing Gonzalez to obtain cash from the conspiracy's money supply, furthered the cocaine conspiracy's purpose as well as kept Gonzalez abreast and knowledgeable about the conspiracy. Thus, Estevez' statements to Gonzalez were obviously "in furtherance" of the drug distribution conspiracy and were properly admitted at trial.

## V.

### ADMISSION OF FINGERPRINT EVIDENCE

Herrero next alleges that the district court erroneously admitted fingerprint evidence. During pre-trial discovery the government provided Herrero with access to the government expert's official fingerprint examination report that stated that Herrero's fingerprints were found on the seized plastic bags containing cocaine. From Haro's opening statement it is evident that both parties mistakenly assumed that Herrero's fingerprints were found on the exterior of certain cocaine packages. The parties were not aware at that time of the existence of both inner and outer plastic bags surrounding the cocaine. Herrero's attorney declared in his opening statement:

"Now it's hard to dispute fingerprints. And I don't suppose we can dispute them.... If my client touched that dope, it's because the dope was stored in the garage at the time my client was working in the garage.... You're going to find that the inner bags of cocaine had a lot of prints, and I don't believe they've found any on the tin foil, and then the outer wrapping with the silver tape, and it's on that outer wrapping where you can't see the cocaine because the tin foil is in the way. Juan Herrero's prints are

on three of the 30 bags we are talking about."

A few minutes before the government's fingerprint expert testified at trial, Herrero's attorney was informed that Herrero's fingerprints were indeed on plastic bags that contained cocaine, but that these prints were to be found on plastic bags that were contained within other plastic bags. Neither of the respective counsels seemed to be aware until the day of the fingerprint expert's testimony, that there were separate inner and outer plastic bags, and that Herrero's fingerprints were found on the inner bags.

Herrero's attorney raised this problem immediately prior to the testimony of the government's fingerprint expert, alleging that the discrepancy between his opening statement and the evidence received at trial could prejudice the jury's opinion of his client. At that time Herrero requested a specifically tailored jury instruction on this point, and the government did not object to the request. Indeed, Herrero's attorney made the following suggestion for a jury instruction:

> "How about if the Court does something like this. I made that statement, I said to them, and as a matter of fact, I discussed the package in detail on my opening and I said my client's prints were found on the very exterior of the package and if the Court could just say, Mr. Mishlove made that statement in opening, in reliance upon information provided to him by the United States Government, boom, leave it at that."

The government's fingerprint expert was then called to the stand. Following testimony and a stipulation concerning the expert's qualifications, and prior to receipt of any substantive testimony from the fingerprint expert, the court gave an instruction concerning the role of an expert witness and then continued with the following specifically tailored instruction:

> "While we are at this point, attorneys are always most conscious of the fact that when they make their opening statements and they say that the evidence is going to be thus and so, that they better

produce on what they say they are going to produce because obviously, if you are in the jury and a lawyer stands up and says the evidence is going to show such and so, and then it doesn't, why, it puts him and his client in a very poor light. I have been asked to make an explanatory statement to you.
>
> Mr. Mishlove [Herrero's attorney] in his opening statement indicated on the basis of information that he had at that time that his client's fingerprints would be identified as having been on the exterior plastic of one of these, one or more of these packages. Now, apparently there was a miscommunication. He got that information and of course, through the Government, in the course of discovery, pretrial, and there was a miscommunication and that is not in fact where the fingerprints were, will be shown to have been. But that can await the proof that the Government will be putting in. All I am doing, and this is by stipulation between the parties, is explaining to you that when Mr. Mishlove made that statement to you during his opening, that he was acting upon the information that had been provided to him and it was in fact erroneous. So you should not hold him to that particular part of his statement to you."

At the end of the day on which the fingerprint expert testified, Herrero argued that the instruction that he had originally requested was inadequate to protect his rights and further that the breakdown in the discovery process might affect his decision on whether to testify. He moved to strike the fingerprint testimony, and the court rejected the motion. Herrero renewed the motion to strike following the conclusion of closing arguments. At that point Herrero speculated that the change in defense theories necessitated as a result of the discovery problems meant that the jury might wonder why Herrero had not taken "the witness stand to explain the difference between counsel's opening and closing." The court rejected the renewed motion stating "I made an explanation to the jury at the time. I felt then that it was sufficient, and I feel that it is sufficient now."

Herrero "carries a heavy burden on appeal because an evidentiary ruling will be reversed only if the trial court committed *'a clear abuse of discretion.'"* *Jones v. Hamelman,* 869 F.2d 1023, 1027 (7th Cir. 1989) (quoting *Bohannon v. Pegelow,* 652 F.2d 729, 732 (7th Cir.1981) (emphasis in *Jones* ). Furthermore, issues relating to the discovery process are " 'committed to the sound discretion of the district court and an error in [such a determination] is reversible only on a showing that the error was prejudicial to the substantive rights of the defendant.'" *United States v. Grier,* 866 F.2d 908, 919 (7th Cir.1989) (quoting *United States v. Bastanipour,* 697 F.2d 170, 175 (7th Cir.1982)).

■ There can be no question that Herrero's fingerprints on the cocaine packages were very relevant, damaging and probably very convincing on the question of his involvement in the cocaine conspiracy, as they confirm Herrero's participation in the cocaine enterprise with Orlando Estevez as well as Elena Gonzalez' testimony concerning Herrero's role as a drug supplier. We will reverse the court's admission of this relevant evidence only if all of the following three requirements are met: (1) the irregularities in the discovery process constituted violations of the discovery rules, (2) if the results of this violation prejudiced Herrero's "substantive rights" *and* (3) if the striking of the evidence was an appropriate sanction for alleged discovery problems.

■ The second element, absence of a violation of Herrero's substantive rights disposes of this matter. *See Grier,* 866 F.2d at 919–22 (Relying upon absence of infringement of substantive rights as a sufficient basis for holding that alleged criminal discovery violation was not reversible error). In *Grier* we explained that:

"The 'substantive rights' or 'substantial rights' standard this court utilized in *United States v. Bastanipour,* 697 F.2d 170, 175 (7th Cir.1982), stems from Federal Rule of Criminal Procedure 52(a) which states that: 'Any error, defect, irregularity or variance which does not affect substantial rights shall be dis-

regarded.' Unlike the harmless error standard, the government is not required to demonstrate that the error was harmless beyond a reasonable doubt. Rather, the government must establish only that the error had no 'substantial influence on the verdict.' *United States v. Kotteakos,* [328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) ]. The Supreme Court in *Kotteakos,* [328 U.S. at 764–65, 66 S.Ct. at 1247–48], explained the standard in the following manner:

'If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phrase affected by the error. It is rather, even so, whether the error itself had substantial influence.' (Footnote and citation omitted)."

Herrero alleges that he was prejudiced because the change in defense theories necessitated as a result of the newly discovered evidence raised questions in the jury's mind that could only be resolved through Herrero's testimony, and thus put Herrero in a position where he was impermissibly pressured to testify. We disagree with Herrero as his assertion falls far short of squaring with the facts in the record. Prior to hearing the fingerprint testimony, the court informed the jury, at Herrero's request, of the precise reason for the possible change that might take place in Herrero's theory of defense. Based upon our review of the record and, in particular, considering the court's timely, thorough and well tailored instruction, we disagree with Herre-

ro's claim that the jury would have questions about any change in defense strategy.

Statements from Orlando Estevez concerning Herrero's role as a supplier of drugs to the conspiracy, together with both the direct and circumstantial evidence of drug transactions between Herrero and Estevez recounted in Elena Gonzalez' testimony and the fingerprint evidence, establish Herrero's active participation in the conspiracy beyond a reasonable doubt. Thus, based upon the presentation of more than sufficient evidence against Herrero combined with Herrero's failure to demonstrate prejudice, we hold that the admission of the fingerprint evidence following discovery problems did not "substantially influence" the jury's verdict and hold that the court properly exercised its discretion in determining that Herrero was not prejudiced as a result of inadequacies in discovery procedures and the reception of the expert fingerprint testimony. Thus, we are of the opinion that the court appropriately denied Herrero's motions to strike and its reception of the fingerprint testimony following the delivery of its instruction to the jury explaining the change in the anticipated testimony of the fingerprint expert was proper.

## VI.

### SUFFICIENCY OF THE EVIDENCE

Haro alleges that the evidence of his money laundering activity was insufficient to support his conviction for conspiracy to possess with intent to distribute and distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(2) (the Controlled Substances Act) and 18 U.S.C. § 2. Specifically, Haro asserts that his actions in this case did not constitute knowing participation in the Estevez drug conspiracy. "In evaluating [Haro's] sufficiency of the evidence challenge, we note that [he] bears a heavy burden. Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.'" *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.

1984)). "The test is whether after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pritchard*, 745 F.2d at 1122 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

"As we emphasized in *United States v. Giangrosso*, 779 F.2d 376, 382 (7th Cir. 1985): *'[T]his court is not the trier of fact and we are required to uphold the [trier of fact's] verdict where "any rational trier of fact" could have found the defendant guilty of the crime.'* ... *'Only when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.'* Nesbitt*, 852 F.2d at 1509 (quoting *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) which quoted in turn, *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985)) (emphasis added)." *United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988). "This [evidentiary standard] includes, in conspiracy cases, circumstantial as well as direct evidence." *United States v. Williams*, 858 F.2d 1218, 1221 (7th Cir.1988).

"A conspiracy is a 'combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act.'" *United States v. Herrera*, 757 F.2d 144, 149 (1985) (quoting *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983)). "Thus, the 'essential elements of a conspiracy under § 846 [of the Controlled Substance Act] are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act.'" *Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir.1982)).

"Under a combination § 841(a)(1), 846 prosecution, the government must prove that the defendant knew of the conspiracy

to [possess with intent to distribute and distribute] drugs and that he intended to join and associate himself with its criminal design and purpose." *United States v. Griffin*, 827 F.2d 1108, 1117 (7th Cir.1987), *cert. denied*, 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988). As we observed in *United States v. Xheka*, 704 F.2d 974, 988–89 (7th Cir.1983):

> "Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict.... [M]ere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. However, while 'mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence of a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.'"

(Quoting *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978)) (citations omitted). As we noted in *United States v. Grier*, 866 F.2d 908, 924 (7th Cir.1989):

> "To convict a defendant of participation in a single conspiracy with other defendants, it is sufficient if it is established that:
>
>> '[t]he parties to the agreement were aware that others were participating in the scheme. The co-conspirators must have "knowingly embraced a common criminal objective." *United States v. Ras*, 713 F.2d 311, 314 (7th Cir.1983). However, there is no requirement that the participants in the plan "personally know the individuals involved ... [a]s long as the conspiracy continues and its goal is to achieve a common objective." *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.), *cert. denied*, [474] U.S. [818, 106 S.Ct. 63, 88 L.Ed.2d 51] (1985) (citation omitted).' *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir.1986). Further, this

court has held that ' "if each [defendant retailer] knew, *or had reason to know*, that other retailers were involved with the ... [drug kingpin's] organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the [trier of fact] *could find* that each had, in effect, agreed to participate in the overall scheme." *United States v. Baxter*, 492 F.2d 150, 158 (9th Cir. 1973) (emphasis added).' *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir.1985). In other words, '[if] the facts indicate that the defendant must have known something ... then a [trier of fact] may be able to find beyond a reasonable doubt that he did know it, especially since the requirement of knowledge is satisfied by proof that the defendant willfully shut his eyes for fear of what he might see if he opened them. *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.1985).' *Cerro*, 775 F.2d at 911."

"Circumstantial evidence may appropriately be utilized to demonstrate both a conspiracy and the defendant's participation in the conspiracy." *Vega*, 860 F.2d at 793. "Because conspiracies are carried out in secret, direct proof of agreement is rare." *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988) (citations omitted). As we observed in *Grier*, 866 F.2d at 923:

> " 'Not only is the use of circumstantial evidence permissible, but "circumstantial evidence 'may be the sole support for a conviction.' " ' *United States v. Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). ' "Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." ' *Williams*, 798 F.2d at 1039 (dissenting opinion) (quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir.1974)). *See also*

*Wisconsin Jury Instructions—Criminal, No. 170* ('[C]ircumstantial evidence may be stronger and more convincing that (sic) direct evidence'). '[T]he evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley,* 707 F.2d 622 (1st Cir.1983)).' *Koenig,* 856 F.2d at 854."

In weighing both direct and circumstantial evidence:

"[Triers of fact] are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See* [*United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986)]. While '[c]ommon sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.' *Id.*"

*Nesbitt,* 852 F.2d at 1511. Not only do we recognize the trier of fact's general knowledge of the facts of life, we also acknowledge the trier of fact's role as the arbiter of credibility:

"[W]e defer to the [trier of fact's] determination of witnesses' credibility. As we noted in *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986): 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.' Similarly, we have stated: ' "It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact." ' *United States v. Perry,* 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman,* 728 F.2d 846, 856 (7th Cir.1984)). Finally, 'the credibility of witnesses is peculiarly within the province of the [trier of fact] and our review of credibility is prohibited absent extraordinary circumstances.' *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir. 1985)."

*Vega,* 860 F.2d at 794.

█ Turning initially to the question of whether a conspiracy existed, the record was replete with evidence that the Estevez drug distribution conspiracy was a "combination or confederation between two or more persons formed for the purpose of committing by their joint efforts a criminal act." *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983). Evidence of the Estevez drug conspiracy included Orlando Estevez' purchase of cocaine from Juan Herrero in Florida, Celestino Estevez' and Armando Martinez' transportation of cocaine to Milwaukee, distribution of cocaine in the Milwaukee area through individuals including government witness, Larry Jackman, and Celestino Estevez', Orlando Estevez', Elena Gonzalez' and Armando Martinez' transportation of proceeds from the Milwaukee cocaine sales to the conspiracy's Florida base. There can be no doubt that the evidence of this cocaine distribution network, that involved many people and operated extensively in two states, demonstrated a conspiracy under 21 U.S.C. §§ 846 and 841(a)(2).

█ "The only question remaining is whether the evidence in the record also supported the jury's determination that [Haro] knowingly and intentionally became part of the cocaine distribution conspiracy." *United States v. Diaz,* 876 F.2d 1344, 1353 (7th Cir.1989). "Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between the defendant and conspiracy is slight, is sufficient to convict." *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.1983). As in *Diaz,* Jose Haro "performed several acts that, if knowingly and intentionally carried out, would clearly establish [his] involvement in the conspiracy." *Diaz,* 876 F.2d at 1354. Between September 17, 1985, and August 14, 1986, Haro converted cash into cashier's checks, in amounts less than the $10,000 minimum required to be reported to the government, as a means to purchase three pieces of real estate in the Miami, Florida area. In addition, a mortgage was secured on one of the properties to provide a source for payment for mortgages on other property. In con-

**1534**

versations with Elena Gonzalez, Haro made it known that he treated money in certain bank accounts as belonging to Orlando Estevez. Haro, in fact, opened a new bank account with the money returned from a state court bail deposit check insuring the court appearance of Orlando Estevez' brother, Omar. Haro further requested and received cash from Orlando Estevez on one occasion when money was needed to complete the purchase of a property Orlando desired. The properties Haro purchased were all subsequently occupied by members of the family of the conspiracy's kingpin, Orlando Estevez, or treated by Estevez as property on which Estevez would eventually build his own home. The Estevezes made extensive improvements at the 95th Street property and never paid rent to Haro for their occupancy of the properties. Finally, Haro drafted and then backdated purchase option agreements in an attempt to explain why the Estevezes had made significant improvements upon the properties. Based upon the foregoing evidence a jury could and did reasonably find that Jose Haro actively engineered and participated in a pattern of converting cash from the Estevez drug conspiracy into Miami real property. Relying upon this determination, the jury could also have reasonably found that Haro's legal counsel and implementation of such legal advice furthered the Estevez drug conspiracy in that they converted drug proceeds to real estate holdings through methods that evaded governmental monitoring of the conspiracy's proceeds.

As in *Diaz*, Haro "essentially contends that, even if the jury were to believe the evidence the government presented concerning [his] activities in the cocaine distribution operation, [he] did not knowingly and intentionally join the conspiracy," [10] because he was unaware of the conspiracy's purpose of distributing *cocaine in Milwaukee, Wisconsin.* "It is well established that a conspirator need not know all of the members or details of a conspiracy to be

held responsible as a co-conspirator." *United States v. Missick*, 875 F.2d 1294, 1297 (7th Cir.1989). "Further, with respect to the question of knowing participation in a conspiracy, it is well settled that '[i]f the facts indicate that the defendant must have known something ... then a jury may be able to find beyond a reasonable doubt that [he] did know it, especially since the requirement of knowledge is satisfied by proof that the defendant willfully shut [his] eyes for fear of what [he] might see if [he] opened them, *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.1985).'" *Diaz*, 876 F.2d at 1354 (quoting *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir.1985)).

■■■ We now turn specifically to Haro's claim that he lacked knowledge of the Estevez' conspiracy's purpose. Haro initially alleged that he was unaware of the conspiracy's purpose of distributing cocaine.[11] However, the evidence establishes that (1) Haro and Estevez maintained a close business relationship; (2) Haro purchased real property for Estevez by devising legal schemes whose main purpose was to evade governmental detection; (3) Haro practiced law in an area (Miami, Florida) in which the presence of cocaine dealing is well known; (4) Haro personally assisted the Estevez family in their efforts to secure a $50,000 cashier's check to post bail when Orlando Estevez' brother, Omar Estevez, was arrested for cocaine trafficking at a time prior to Haro's performance of any of the money laundering procedures; (5) Haro used some of the proceeds from this bail check to purchase real estate; and (6) Haro was contacted by a Milwaukee DEA agent concerning a drug investigation involving Orlando Estevez. Based upon the totality of the record a jury clearly would have a reasonable basis for finding that Haro was aware that Orlando Estevez' drug conspiracy dealt in the narcotic cocaine.

■■■ But, it was not essential that the jury determine that Haro knew that Estevez distributed the specific narcotic drug

---

**10.** *Diaz*, 876 F.2d at 1354.

**11.** Although Haro does not admit that he knew of the conspiracy's dealings in controlled sub-

stances, he contends he was unaware of dealings in cocaine.

classified as cocaine. In light of the fact that "a conspirator need not know all of the ... details of a conspiracy to be held responsible as a co-conspirator," *Missick*, 875 F.2d at 1297, a jury need only find that Haro possessed the requisite knowledge that Orlando Estevez dealt in a controlled substance. *Cf. United States v. Cheung*, 836 F.2d 729, 731 (1st Cir.1988) ("While Cheung may not have known whether the bag contained heroin, cocaine, or some other granular 'controlled substance,' *see* 21 U.S.C. § 841(a)(1), 'the law is settled that a defendant need not know the exact nature of a drug in his possession to violate § 841(a)(1).' *United States v. Kairouz*, 751 F.2d 467, 469 (1st Cir.1985)...."); *United States v. Lopez–Martinez*, 725 F.2d 471, 475 (9th Cir.1984); *United States v. Gonzalez*, 700 F.2d 196, 201 (5th Cir.1983) ("[T]he government is not required to prove that a defendant knew the exact nature of the substance with which he was dealing; it is sufficient that he was aware that he possessed some controlled substance."); *United States v. Lewis*, 676 F.2d 508, 512 (11th Cir.1982); *United States v. Morales*, 577 F.2d 769, 776 (2nd Cir.1978) (Cases stating that knowledge of the specific controlled substance possessed or dealt in is unnecessary for conviction under federal drug statutes prohibiting possession or distribution of controlled substances).

Haro's claim of lack of knowledge of the conspiracy's purpose, based upon his asserted unawareness of the exact locale of Estevez' cocaine distribution is resolved in a similar fashion. In light of the close relationship between Haro and Orlando Estevez, the significant property transactions conducted involving Haro and Estevez, the telephone conversations between Haro and Estevez when Estevez was in Milwaukee and the October 1985 contact between Milwaukee based DEA Agent, Robert Hartman and Haro in which Hartman advised Haro that he needed to speak with Orlando Estevez concerning a vehicle that had been seized pursuant to a suspected drug violation in Milwaukee, Wisconsin, there clearly was sufficient evidence for a reasonable jury to find that Haro obviously had knowledge of the Milwaukee drug distribution activities of the Estevez conspiracy.

Again, however, such a finding would not have been necessary for the jury to convict Haro of knowing participation in the conspiracy. "[T]here is sufficient evidence to convict one of a single conspiracy if the evidence establishes that the individual is aware of the 'essential features and broad scope' of the conspiracy and that the co-conspirators are united in a 'common single goal.'" *Grier*, 866 F.2d at 926 (quoting *Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947)). The evidence of Haro's relationship with Estevez and knowledge of his drug transactions set forth previously provide a sufficient basis for a rational jury to conclude beyond a reasonable doubt that Haro certainly knew that Estevez was involved in a conspiracy to distribute controlled substances. Because Haro was aware of the essential features of the drug conspiracy, and because his money laundering activities united him with others in the conspiracy's goal of distributing drugs, the evidence was more than sufficient to convict even if Haro had not been aware of the precise geographic area in which other members of the conspiracy distributed drugs.

The evidence certainly was sufficient for the jury to find that Haro displayed his obvious knowledge of the currency laws in knowingly and intentionally structuring the transactions involved in purchasing real estate for Orlando Estevez. He accomplished this through deceptive methods designed to advance this interstate drug conspiracy's purpose of distributing cocaine and permitting its kingpin to enjoy the fruits of his labors without fear of governmental detection. Furthermore, the evidence set forth in the previous discussion provided a basis for the jury to properly find that Haro was aware of the "essential purpose" of the conspiracy to distribute controlled substances, even if Haro was not aware of every specific detail. As in *United States v. Adamo*, 882 F.2d 1218, 1225 (7th Cir.1989): "Considering 'all the evidence and all the reasonable inferences

that can be drawn from the evidence in the light most favorable to the government,' we are convinced that a rational jury could find that [Haro] knowingly joined and actively participated in the cocaine distribution conspiracy and associated himself with its criminal design and purpose." (Quoting *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988)). Thus, we agree with the jury's finding that Haro knowingly and intentionally participated in the Estevez drug conspiracy.

## VII.

### *JURY INSTRUCTIONS*

Haro and Martinez challenge the district court's jury instructions. Haro asserts that the district court erred in failing to give the jury certain instructions Haro proposed. Both Haro and Martinez contend that the district court erroneously gave the jury a "conscious avoidance" or "ostrich" instruction.

In *United States v. Grier*, 866 F.2d 908, 932 (7th Cir.1989) we discussed the law applicable to our review of a trial court's decision concerning jury instructions:

"Turning to the substantive law applicable to review of the jury instructions given in both defendants' cases, in *United States v. Douglas*, 818 F.2d 1317, 1320–21 (7th Cir.1987), we held that

'[a] defendant is entitled to an instruction on his or her theory of defense if: the defendant proposed a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; *and* the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial.'

(Emphasis added) (citations omitted). We have repeatedly emphasized that when reviewing instructions we consider them as a whole in determining whether or not a court erred in refusing to give a particular instruction. In *United States v. Fournier*, 861 F.2d 148, 150 (7th Cir. 1988), we stated:

' "It is axiomatic that in determining the propriety of instructions they are to be viewed as a whole. As long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal." '

(quoting *United States v. Perlaza*, 818 F.2d 1354, 1358 (7th Cir.), *cert. denied*, 484 U.S. 861, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987) quoting, in turn, *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977)). We further explained the importance of construing the instructions in light of the context of the overall trial in our recent decision in *United States v. Bailey*, 859 F.2d 1265, 1277 (7th Cir.1988):

'When examining the sufficiency of jury instructions we must examine the jury charge as a whole, rather than focus on isolated passages. Moreover, because " 'a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence and instruction of the jury by the judge,' " we review the instructions in the context of the overall trial and the arguments of counsel. *See United States v. Piccolo*, 835 F.2d 517, 519 (3d Cir.1987) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 [94 S.Ct. 396, 400, 38 L.Ed.2d 368] (1973)).' "

Initially, we examine the instructions that Haro proposed and were rejected by the trial court. One of Haro's proposed instructions asked the court to instruct the jury that money laundering itself was not a crime and that the government needed to prove beyond a reasonable doubt that this activity was vital to the success of the conspiracy's purpose of distributing cocaine in Wisconsin. The second proposed instruction stated that the government needed to prove that Haro had knowledge of the conspiracy to distribute cocaine in Wisconsin and that he conducted himself in a way that specifically facilitated the success of the conspiracy's objective. The next two instructions noted that structuring transactions to avoid currency transaction report requirements was not itself a crime and

would have required the government to establish that the involved cash came from drug proceeds, that listing the houses in Haro's name was integral to the success of the cocaine distribution ventures and that Haro should have known of the activities of conspirators involved in transporting cocaine to and distributing cocaine in Wisconsin. The final proposed instruction stated that Haro must be found not guilty if the jury determined that he was involved in a conspiracy other than the one charged.

In examining the district court's conspiracy instruction, we note that many of the subjects of Haro's proposed instructions were included in the district court's instructions. For example, with respect to Haro's proposed instruction concerning the legality of structuring transactions, the district court instructed the jury that: "It is not a crime to structure a transaction to avoid having a bank file a currency transaction report." Likewise, the district court instructed the jury that "if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy."

 With respect to Haro's proposed instructions regarding proof of a connection between his money laundering activities and the purposes of the conspiracy, the court provided the jury with the following guidance: "Before the jury can find that a defendant or any other person has been—has become a member of a conspiracy, the evidence in the case must show beyond a reasonable doubt that the conspiracy was knowingly formed and that this defendant or any other person who's claimed to have been a member willfully participated in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy." We believe that this instruction, when considered with all the other instructions and the evidence presented, was sufficient to make the jury aware of the necessity for a connection to be demonstrated between Haro's money laundering activities and the conspiracy's purpose. We also are convinced that

Haro's proffered instructions that would have required a demonstration that the money laundering was "integral" to the conspiracy's success are without sound legal basis and, thus, misstate the quantum of proof required in a conspiracy case. As the court's instruction makes clear, all that is required is that Haro's activities "advance or further some object or purpose of the conspiracy."

 Finally, we are convinced that the court's instructions adequately addressed questions relating to Haro's knowledge of the conspiracy's objective and scope. The court stated: "One may become a member of a conspiracy without full knowledge of all the details of the conspiracy. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator." The court further instructed: "In order to be a member of the conspiracy a defendant must be aware of the general purpose of the conspiracy and have some interest in its success." These instructions adequately set forth for the jury the knowledge required of one participating in a conspiracy and avoided the misstatements of the law found in Haro's attempts to require the government to prove that he knew of the precise drug being distributed, the location where the drug was distributed and of the activities of co-conspirators in transporting and distributing the drug in that locale. Upon review we are convinced that "the instructions treat the issues fairly and adequately, [and] they will not be interfered with on appeal." *United States v. Fournier*, 861 F.2d 148, 150 (7th Cir.1988).

 We now consider Haro and Martinez' assertion that the court improperly gave a "conscious avoidance" or "ostrich" instruction. The judge instructed the jury that:

"You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut

his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word."

In two recent decisions, we upheld district courts that provided juries with the exact instruction the district court gave in this case. *United States v. Talkington,* 875 F.2d 591, 595–96 (7th Cir.1989); *United States v. Diaz,* 864 F.2d 544, 549–51 (7th Cir.1988). " 'An ostrich instruction informs the jury that actual knowledge and deliberate knowledge are the same thing.' " *Talkington,* 875 F.2d at 596. In *Talkington* we noted that: "In reviewing the decision of a district court to give the [conscious avoidance or ostrich] instruction, we must review the evidence and any reasonable inference from that evidence in the light most favorable to the government." 875 F.2d at 596. We also recognized that: " 'A conscious avoidance instruction is "properly given only when the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." ' " *Id.* (quoting *United States v. White,* 794 F.2d 367, 371 (8th Cir.1986), that quoted, in turn, *United States v. McAllister,* 747 F.2d 1273, 1275 (9th Cir.1984), *cert. denied,* 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 76 (1985)). This is based upon the recognition that

> "[t]he ostrich instruction has been principally employed where there is evidence that the defendant is associated with a group, but where there is also evidence that the defendant consciously was avoiding knowledge of the illegal nature of the group's activity. In most cases, the defendant acknowledges his association with the group but, despite circumstantial evidence to the contrary, denies knowledge of the group's illegal activity."

*Diaz,* 864 F.2d at 550.

Haro acknowledged his association with Orlando Estevez and his family in the purchase of properties, but maintained, despite circumstantial evidence to the contrary, that he did not know of the Estevez drug conspiracy's purpose. In dealing with the ostrich instruction, we also note that there

was convincing evidence that Martinez drove vehicles loaded with cocaine from Miami to Milwaukee and vehicles loaded with cocaine sales proceeds from Milwaukee to Miami, while Martinez' defense theory was that he was unaware of the fact that he was carrying drugs or proceeds from drug sales. Both defendants have, thus, in effect, acknowledged their "association with the [conspiratorial] group but, despite circumstantial evidence to the contrary, [have denied] knowledge of the group's illegal activity." *Diaz,* 864 F.2d at 550. In such cases a "conscious avoidance" instruction is most appropriate, and the district court properly provided the jury with such an instruction.

## VIII.

### *PRESENCE OF A MAP IN THE JURY ROOM*

All three defendants allege that the court should have granted a mistrial on the basis that several jurors were exposed to a map that a juror had brought into the jury room. This incident occurred on the final day of the jury's deliberations and the court described it on the record as follows:

> "The bailiff was making coffee in the jury room and several of the jurors were in there, and he became aware of the fact that they were talking—he wasn't really paying a lot of attention to what they were talking about, and then he heard the word Kendall. And he turned around and discovered that one of the jurors had a map of Florida. He took the map away and got the names of the jurors who were in the jury room at the time. They all told him that all they were doing was looking at the Miami area to find out where Kendall is." [12]

After this explanation was given, the jury returned its verdicts and was polled at the request of defendant Haro. Prior to excusing the jury, the judge questioned the jurors who saw the map. The juror who brought the map stated that he "was just pointing out on the map where Kendall was in relation to Miami," and stated that the

---

**12.** "Kendall" is the location of the 95th and 97th Street properties Haro purchased for Estevez.

map did not alter his decision. A second juror said that she thought the juror who brought the map was "showing some strange thing in Milwaukee," and then "looked over and saw it was Miami." She said she could see some areas on the map, but did not use the map. The third juror merely glanced at the map on the way to the bathroom. The fourth juror stated that "[t]here wasn't even a chance to discuss [the map] because as soon as he put it down and said, here's the map of Florida, Ken [presumably the bailiff] was right there and saw it." She then went on to say that she was sure that the map did not affect her decision, a statement in which the remaining three jurors concurred.

Following the court's examination, the three defendants moved for mistrials on the basis of the map's presence in the jury room. The court denied the mistrial motion stating:

> "Let the record show that the Court has considered this since it became aware of it. I am satisfied that this incident while it was untoward, was inconsequential in terms of the deliberations of the jury. I am satisfied that it was not something that would have affected their decision one way or another, and we have the statements of all of them to the effect that it did not. I do not believe that it rises to the height of a defect that would cause this court to abort the process. And I feel that I should and I do herewith at this time deny the motion for a mistrial."

In *United States v. Bruscino,* 687 F.2d 938, 940 (7th Cir.1982) (en banc), we observed that:

> "A criminal defendant in our system has a right to be tried on the basis of the evidence admitted at his trial, and this right may be violated if the jury gets access to extra-record evidence such as is found in newspaper accounts of the trial or administrative records, even if that access is not the result of any prosecutorial misconduct."

687 F.2d at 940.

> "Nevertheless, a new trial is not required automatically whenever a jury is exposed

to material not properly in evidence. Rather, a new trial is required only when there is a 'reasonable possibility' that the material affected the jury verdict. Each case 'must turn on its special facts,' *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959), and in each case the crucial factor is 'the degree and pervasiveness of the prejudicial influence possibly resulting' from the jury's exposure to the extraneous material. *United States v. Solomon,* 422 F.2d 1110, 1118 (7th Cir.1970). The trial court has the primary responsibility for making this determination of prejudice, and an appellate court must review the trial court's determination under an 'abuse of discretion' standard."

*United States v. Weisman,* 736 F.2d 421, 424 (7th Cir.1984) (citations omitted). In *United States v. Key,* 859 F.2d 1257, 1264 (7th Cir.1988), we recently discussed the policies underlying the abuse of discretion standard and its application in cases in which a judge has questioned jurors regarding their verdict:

> "As *Bruscino* makes clear, we review the judge's determination of prejudice (or lack thereof) for an 'abuse of discretion' only, for 'the inquiry into prejudice becomes a matter of addressing the probabilities that a particular jury was prejudiced by particular documents. [Thus], [t]he trial judge will always be in a better position than the appellate judges to assess the probable reactions of jurors in a case over which he has presided.' As *Bruscino* states:
>
> > 'He [the trial judge] has had the opportunity to observe the jurors' demeanor and gauge the attentiveness, as the appellate judges have not. He can also judge, as we cannot, whether the atmosphere of the trial—that congeries of intangibles that no stenographic transcript can convey—might have made the jury receptive to being prejudiced by the documents in question, or for that matter, might have inoculated it against such prejudice. As we cannot put ourselves in the district judge's shoes in these matters we ought to

accept his judgment unless we have a very strong conviction of error.'

687 F.2d at 941. Admittedly, *Bruscino* dealt with the situation in which the judge was prohibited from questioning the jurors because they had already given their verdict. Still, the reasons for according great deference to the judge's determination of prejudice (i.e. the ability to observe the jurors' demeanor) apply with equal (if not greater) force to a case where the judge has in fact questioned the jurors. Thus, we apply *Bruscino*'s abuse of discretion standard in analyzing the propriety of the judge's finding of a lack of jury prejudice."

(Citations omitted).

■■■■■ As a preliminary matter, we note that while the trial judge brought this matter to the litigants' attention prior to receipt of the jury's verdict, he delayed his examination of the jurors until after the verdict had been given. There is dicta in *Bruscino* stating that "the judge is prohibited from questioning the jurors, after they have given their verdict, to determine whether their deliberations were in fact prejudiced by the introduction of documents not in evidence, Fed.R.Evid. 606(b)." [13] But, we note that Federal Rule of Evidence 606(b) does permit examination of a juror after verdict concerning "whether extraneous prejudicial information was improperly brought to the jury's attention...." Whatever the possible resolution of this question may be, none of the defendants ever brought this problem to the attention of either the district court or this court. Thus, the defendants have waived any arguable assertion of error attributable to the timing of the trial court's examination of the jurors. *See Zelazny v. Lyng*, 853 F.2d 540, 542 n. 1 (7th Cir.1988) ("We have said that an appellant is required by Rule 28(a)(4) of the Federal Rules of Appellate Procedure to present in his brief to the appellate court the issues that he desires to litigate and to support his arguments on those issues with appropriate judicial authority.... [E]ven if Mr. Zelazny disputes the district court's determination of inexcusable delay, he has waived any argument on that issue"). Further, we certainly do not believe that irregularities in timing of the examination, if any, rose to the level of "plain error" necessary to overturn a conviction in the absence of a timely objection.

■■■■ Turning to the question of whether the district court properly exercised its discretion in denying the defendants' requests for a mistrial based upon the brief presence of the map in the jury room, we note initially that "immediately upon discovering the possibility of juror misconduct, the judge conducted an inquiry into the prejudicial effect of the extraneous information as required in this circuit." *Key*, 859 F.2d at 1265. We have recognized the importance of such action in two previous decisions. *See Key*, 859 F.2d at 1265; *Weisman*, 736 F.2d at 426. As in *Key*, based upon such a hearing, the trial judge "properly found that the extra-record information—confined to [only a few] of the twelve jurors—did not impact on the verdict itself." 859 F.2d at 1265. Similarly, as in *Key* and *Weisman*, there was no significant discussion among the jurors of the contents of the extra-record material. *See Key*, 859 F.2d at 1264; *Weisman*, 736 F.2d at 425. Furthermore, "because the jurors saw the [map] at the end of the trial, there was absolutely no risk that the contents of the [map] caused them to prejudge the case before hearing all the evidence." *Weisman*, 736 F.2d at 425–26. Finally, our independent review of the record confirms that the "overwhelming nature of the evi-

---

**13.** 687 F.2d at 941. Federal Rule of Evidence 606(b) reads, in relevant part:

"(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror...."

dence against [Herrero, Haro and Martinez] essentially ... negated the possibility that the jury would have reached a contrary verdict." *Key*, 859 F.2d at 1264. In light of all of these factors, we are convinced that the trial judge properly exercised his discretion in finding that there was no reasonable possibility that the presence of the map in the jury room affected the jury's verdict, and in denying the defendants' motions for mistrial.

## IX.

### FORFEITURE OF THE RED ROAD PROPERTY

Haro challenges the court's decision ordering the forfeiture of the Red Road property on two grounds.[14] Initially, Haro alleges that the forfeiture order must be reversed because it relies upon 21 U.S.C. § 853(d), which sets up a rebuttable presumption that property is subject to forfeiture when the United States establishes by a preponderance of the evidence that the "property was acquired during the course of a violation of this subchapter or subchapter II or this chapter or within a reasonable time after such period," and "there was no likely source for such property other than the violation...."[15] Haro asserts that this presumption improperly requires a lesser quantum of evidence than proof beyond a reasonable doubt and, thus, unconstitutionally shifts the burden of proof to the criminal defendant. Secondly, Haro asserts that the forfeiture order is unsupported because there was no proof that Haro knew the money utilized to purchase

this property was obtained from the Estevez cocaine distribution conspiracy.

█ As the district court recognized, the constitutionality of 21 U.S.C. § 853(d) is a matter of first impression in this circuit.[16] However, the Third Circuit upheld the constitutionality of this statute in *United States v. Sandini*, 816 F.2d 869, 874–76 (3rd Cir.1987). The district court relied upon *Sandini* as the exclusive basis for its conclusion that the statute was constitutional and quoted quite extensively from the Third Circuit's opinion. *Sandini* held that the rebuttable presumption 21 U.S.C. § 853(d) creates is constitutional because forfeiture is not an element of the offense, but only punishment for an offense upon which a conviction has already been entered. The Third Circuit observed:

"Unquestionably, the burden of proof beyond a reasonable doubt applies to the elements of a criminal offense and is constitutionally mandated.... [H]owever, forfeiture is punishment for the crime. Forfeiture is not an element of the continuing legal enterprise offense, but simply an additional penalty for that proscribed conduct.

The argument that forfeiture is an element which must be proved beyond a reasonable doubt confuses culpability with consequences. Section 853(a) expressly says that '[t]he court in imposing sentence ... shall order, in addition to any other sentence ... that the person forfeit ... all property described in this subsection. The statute, in effect, characterizes forfeiture as punishment for

**14.** The district court's decision on this issue is reported at 685 F.Supp. 1468 (E.D.Wis.1988).

**15.** 21 U.S.C. § 853(d) reads:
"(d) There is a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter or subchapter II of this chapter is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that—
"(1) such property was acquired by such person during the period of the violation of this subchapter or subchapter II of this chapter or within a reasonable time after such period; and

"(2) there was no likely source for such property other than the violation of this subchapter or subchapter II of this chapter."

**16.** *See United States v. Haro*, 685 F.Supp. 1468, 1472 (E.D.Wis.1988). The government alleges that it is unnecessary for this court to pass upon the constitutionality of 21 U.S.C. § 853(d)'s rebuttable presumption because the district court found beyond a reasonable doubt that Haro acted as a nominee in purchasing this property with the profits of the Estevez drug conspiracy. It appears to us, however, that the district court relied upon the rebuttable presumption of 21 U.S.C. § 853(d) as a necessary element of its decision. Thus, we will pass upon the statute's constitutionality.

the crime and not part of the offense itself."

*Sandini*, 816 F.2d at 875. We are convinced, as was the district court, that the Third Circuit's decision in *Sandini* appropriately distinguishes between elements of the crime, that must be proven beyond a reasonable doubt, and punishment following proof of the crime, which need not be supported with evidence beyond a reasonable doubt.

This holding is not in conflict with our construction of RICO's criminal forfeiture provisions in *United States v. Horak*, 833 F.2d 1235, 1243–44 (7th Cir.1987). In *Horak*, we noted that:

> "at oral argument counsel for the government answered questions about the relevant burden of proof by agreeing with Horak that the government must prove the relevant facts beyond a reasonable doubt to win forfeiture under section 1963. It seems, therefore, that the government has agreed that on remand it must establish the necessary causal connections under section (a)(1) beyond a reasonable doubt."

833 F.2d at 1243. An examination of *Horak* demonstrates, initially, that its holding was based upon the parties' agreement concerning the burden of proof under the RICO forfeiture statute. Therefore, *Horak* does not appear to reflect a definitive ruling of this court, even on the burden of proof applicable in a RICO forfeiture proceeding. Secondly, the RICO forfeiture statute, unlike 21 U.S.C. § 853(d), is silent on the question of the burden of proof required to establish a forfeiture. Thus, even if *Horak* is construed as requiring proof beyond a reasonable doubt of the connection between property subject to forfeiture and a RICO violation, *Horak* can be viewed as establishing a statutorily based rule applicable to RICO rather than a constitutionally based rule applicable to all criminal forfeiture proceedings, including those where Congress has supplied a different burden of proof. Accordingly, we are of the opinion that *Horak* does not require that 21 U.S.C. § 853(d) be invalidated on the ground that it unconstitutionally permits criminal forfeiture with a lesser quantum of evidence than proof beyond a reasonable doubt.

■ Turning to the application of the involved proof standards to this case, there can be no question that the government established the rebuttable presumption that the Red Road property was subject to forfeiture. As the district court observed, "there is no dispute that the Red Road property was purchased during" the time period of the cocaine distribution conspiracy charged in the indictment, *Haro*, 685 F.Supp. at 1475, thus satisfying the first prong of the rebuttable presumption that property is subject to forfeiture. The district court also found that "the government has established that there was no likely source for the purchase of the property other than the cocaine conspiracy," *id.*, thereby satisfying the second prong of the rebuttable presumption. In making its determination on the second prong, the court relied upon the following evidence:

> "First, the testimony showed that defendant Haro was only the nominal owner of the property and that the true owner was Orlando Estevez, the head of the cocaine ring. Second, all but $5,384.05 of the money used for the deposit and closing was traced to cash. Third, these cash payments were structured in amounts under $10,000 so as to conceal the transfer of a large amount of cash. Fourth, mortgage payments were made from an account opened with a bail check endorsed by Omar Estevez. Fifth, other mortgage payments were made by defendant Haro from a loan on the 95th Street property, which was purchased by defendant Haro in much the same way as the Red Road property. And sixth, defendant Haro's testimony as to the source of the cash bordered on perjury."

*Haro*, 685 F.Supp. at 1475. The trial court's analysis, set forth above, exhaustively marshals the record evidence supporting the rebuttable presumption that the Red Road property was subject to forfeiture, and squares with our own analysis of the record. Thus, the district court properly concluded that the rebuttable presumption was established.

■ In rejecting Haro's attempt to rebut the presumption that the Red Road property was subject to forfeiture the trial court relied upon its finding that Haro's "testimony as to the source of the cash [was] simply incredible and perhaps even perjurious." 685 F.Supp. at 1475 n. 3. The Supreme Court has stated that:

"When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."

*Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (citations omitted). The trial court's credibility finding is not only plausible, it is supported in the objective and documentary evidence that the trial court set forth and that clearly supports the conclusion that the Red Road property was purchased with proceeds from the cocaine conspiracy. *See Haro,* 685 F.Supp. at 1475. Accordingly, we hold that the trial court properly found that Haro failed to rebut the presumption that the Red Road property was subject to forfeiture.

Haro finally asserts that the trial court's forfeiture determination must be reversed because the trial court failed to find that Haro knowingly used drug conspiracy proceeds to purchase the Red Road property. We disagree. In its decision the court made the following "general findings, consistent with the jury verdict, as to defendant Haro's role in the cocaine conspiracy," *Haro,* 685 F.Supp. at 1469:

"Menelao Orlando Estevez, Omar Estevez and others in their family were the heads of a multi-kilogram cocaine distribution ring. The ring was responsible for the transfer of millions of dollars worth of cocaine from Southern Florida to Milwaukee, Wisconsin. Much like a modern corporation, the ring had various personnel performing specific duties. For example, the ring had persons engaged in supply, transportation and distribution. The work of one conspirator was not necessarily known by another. However, *all the members of the ring were aware that its purpose was to unlawfully distribute cocaine in Wisconsin.*

Defendant Haro, a real estate lawyer in Miami, Florida, was a member of that cocaine ring. *Although he may not have known the exact extent and nature of the ring, he knowingly assisted its cocaine distribution through specific legal work.* That legal work included 'laundering' the cash profits of the Estevezes so as to avoid detection of the profits by law enforcement officials. In particular, defendant Haro purchased three parcels of property in his own name when in fact the parcels were to be the property of Orlando Estevez and his family."

685 F.Supp. at 1469 (emphasis added). Because the jury found that Haro knowingly participated in the conspiracy, as reflected in the court's findings in the previous paragraph, all the knowledge necessary for a forfeiture under 21 U.S.C. § 853 had been supplied. As the government successfully established the presumption that the Red Road property was subject to forfeiture under 21 U.S.C. § 853(d) and Haro failed to

rebut this presumption, the district court properly determined that the Red Road property should be forfeited.

The jury's verdict against Haro was based upon proof beyond a reasonable doubt and from our review of the record we are convinced that the trial court did not commit reversible error. Therefore, the convictions of Herrero, Haro and Martinez and the forfeiture of the Red Road property are AFFIRMED.